## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

### CASE NO.: 8:24-cv-00438-SDM-AEP

| | |
|---|---|
| CLARK CHAMBERLIN, a disabled minor child, by and through his parents and co-guardians TODD CHAMBERLIN and KELLI CHAMBERLIN, *on behalf of themselves and all others similarly situated*, | **AMENDED CLASS ACTION COMPLAINT** (corrected as to case caption only at Clerk of Court's request) |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| BOSTON FINANCE GROUP, LLC, a Florida limited liability company; | |
| BOSTON ASSET MANAGEMENT, INC., a Florida corporation; | |
| PROSPECT FUNDING HOLDINGS, LLC, a Florida limited liability company; | |
| PROSPECT FUNDING PARTNERS, LLC, a Delaware limited liability company; | |
| PROSPECT FUNDING HOLDINGS (NY) III, LLC, a New York limited liability company; | |
| LEO J. GOVONI, an individual; | |
| JOHN W. STAUNTON, an individual; | |
| JONATHAN GOLDEN, an individual; | |
| AMERICAN MOMENTUM BANK, a Texas-charted bank; | |

BOSTON HOLDING COMPANY, LLC, a
Florida limited liability company; and

FIDUCIARY   TAX   &   ACCOUNTING
SERVICES LLC, a Florida limited liability
company,

     Defendants.

## AMENDED CLASS ACTION COMPLAINT

Plaintiff Clark Chamberlin, a disabled minor child, by and through his parents and co-guardians Todd Chamberlin and Kelli Chamberlin ("Plaintiffs") bring this Amended Class Action Complaint ("Complaint") against Defendants Boston Finance Group, LLC ("BFG"); Boston Asset Management, Inc. ("BAM"); Boston Holding Company, LLC ("BHC"); Leo J. Govoni ("Govoni"); John W. Staunton, Esq. ("Staunton"); Jonathan Golden ("Golden"); Prospect Funding Holdings, LLC ("Prospect Funding"); Prospect Funding Partners, LLC ("Prospect Finance"); Prospect Funding Holdings (NY) III, LLC ("Prospect III"); Fiduciary Tax & Accounting Services, LLC ("FTAS"), and American Momentum Bank, individually and on behalf of all others similarly situated.  Based upon their own and his counsels' investigation and upon information and belief as to all other matters, Plaintiffs allege as follows:

## INTRODUCTION

1.     This tragic case involves a predatory scheme that began in 2009 and continued at least through 2020 to misappropriate over $100,000,000.00 of special needs trust assets belonging to the most vulnerable members of our society.

2.     The corporate trustee for 2,000 special needs trusts created pursuant to federal law filed bankruptcy on February 9, 2024, almost two years after its current board of directors suspiciously claims to have first become aware of this scheme carried out by the trustee's founders, insiders, attorneys, and their related entities created to perpetrate this unfathomable misappropriation, reporting that over 1,500 of the trusts are missing all or a part of their assets.  The scheme impacts special needs trusts that were created before and after this corporate trustee claimed in the bankruptcy the scheme ended in 2020 because grantors and beneficiaries of special needs trusts created after 2020 have been notified their trust assets have been compromised.

3.     Prior to the bankruptcy filing, no notice of what has now been shockingly revealed was provided by or on behalf of the trustee to those damaged by the misappropriation, leaving already vulnerable individuals without a means of much needed financial support beyond the public assistance they require and receive.   Based on what the trustee has revealed in bankruptcy filings, no

reasonable action was taken to recover the special need trust losses from any of the individuals or entities that bear responsibility.

4.      American Momentum Bank, the bank custodian of special needs trust assets and where the perpetrators also banked during the relevant time period, did nothing to prevent the money from being taken. Despite both committing and knowing about numerous red flags and breaches of fiduciary duty associated with SNT assets in its custody, American Momentum Bank chose to hide its head in the sand rather than address the flagrant issues that any reasonable bank would have acted to address over a decade ago. Therefore, American Momentum Bank also bears liability to the Plaintiffs and Class Members.

5.      A class action is necessary to return the value of the misappropriated, pooled special needs trust assets to their beneficiaries and to hold the individuals and entities involved responsible for the extensive damage done.  Therefore, Plaintiffs for their son, Clark Chamberlin, and on behalf of other similarly situated special needs trust grantors and beneficiaries, files this suit against the Defendants seeking money damages for conversion, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, fraudulent transfers, and unjust enrichment, as well as declaratory relief.

6.      Defendants in this action are individuals and entities that, rather than applying the care and attention warranted to protect crucial SNT assets, caused

and/or aided and abetted the decade-plus misappropriation of $100,000,000.00 of SNT assets through their acts and omissions, in contravention of Plaintiffs and Class Members' rights and resulting in their injuries.

## THE PARTIES

7.     Plaintiffs Kelli Chamberlin and Todd Chamberlin are and at all relevant times were individuals and citizens of Florida.

8.     At all relevant times, Plaintiffs were and currently are the parents and legal guardians of their son, Clark Chamberlin.  In 2011, Plaintiffs were appointed the court-ordered guardians of Clark.  As alleged in more detail below, Plaintiffs are the grantors of a court-approved special needs trust for the benefit of Clark, established and administered by The Center for Special Needs Trust Administration (the "Center"), which is a not a party to this action on account of its February 2024 bankruptcy filing.

9.     Upon information and belief, Defendant Leo J. Govoni ("Govoni") is and all relevant times was a citizen and resident of Pinellas County, Florida.

10.     Upon information and belief, Defendant John W. Staunton, Esq. ("Staunton") is and at all relevant times was a citizen and resident of Pinellas County, Florida.

11.     Upon information and belief, Defendant Jonathan Golden ("Golden") is and at all relevant times was a citizen and resident of Pinellas County, Florida.

12.     Defendant Boston Finance Group, LLC ("BFG") is and at all relevant times was a Florida limited liability company with its principal place of business in Pinellas County, Florida.

13.     Upon information and belief, all members of BFG are citizens and residents of Florida.

14.     Defendant Boston Asset Management, Inc. ("BAM") is and at all relevant times was a Florida corporation with its principal place of business in Pinellas County, Florida.

15.     Upon information and belief, all members of BAM are citizens and residents of Florida.

16.     Defendant Boston Holding Company, LLC ("BHC") is and at all relevant times was a Florida limited liability company with its principal place of business in Pinellas County, Florida.

17.     Upon information and belief, all members of BHC are citizens and residents of Florida.

18.     Defendant Fiduciary Tax & Accounting Services, LLC ("FTAS") is and at all relevant times was a Florida limited liability company with its principal place of business in Pinellas County, Florida.

19.     Upon information and belief, all members of FTAS are citizens and residents of Florida.

20.     At all relevant times, Govoni has served as BFG's and BHC's managing member and BAM's director and president and controlled these entities' operations and affairs alongside Golden and Staunton.  He also co-founded the Center with Staunton.

21.     Upon information and belief, at all relevant times Golden has been a beneficial owner of BFG (previously representing under oath that he is a principal of that entity), BHC, and BAM and controlled these entities' operations and affairs alongside Defendants Govoni and Staunton.

22.     Upon information and belief, at all relevant times Staunton has been a principal of and/or owned membership interests in BFG and stock in BAM and controlled those entities' operations and affairs alongside Defendants Govoni and Golden.  He also co-founded the Center with Govoni.

23.     Defendant Prospect Funding Holdings, LLC ("Prospect Funding") is and at all relevant times was a Florida limited liability company with its principal place of business in Clearwater, Florida.

24.     Upon information and belief, all members of Prospect Funding are citizens and residents of Florida.

25.     Upon information and belief, Defendant Prospect Funding Partners, LLC ("Prospect Finance") is a Delaware limited liability company with its principal place of business in Minnesota.

26.     Upon information and belief, all members of Prospect Finance are citizens and residents of Florida and/or Minnesota.

27.     Upon information and belief, Defendant Prospect Funding Holdings (NY) III, LLC ("Prospect III") is a New York limited liability company with its principal place of business in Clearwater, Florida.

28.     Upon information and belief, all members of Prospect III are citizens and residents of Florida.

29.     Upon information and belief, at all relevant times BFG has owned the membership interests in Prospect Funding, Prospect Finance, and Prospect III.

30.     By virtue of their ownership and/or control of BFG, upon information and belief Govoni, Golden, and Staunton have at all relevant times controlled Prospect Funding, Prospect Finance, and Prospect III's operations and affairs.

31.     At all relevant times, BAM, BFG, BHC, Prospect Funding, Prospect Finance, and Prospect III have been the alter egos and mere instrumentalities of their beneficial owners and/or controllers, Govoni, Golden, and Staunton.

32.     Defendant American Momentum Bank is a Texas-charted bank engaged in business and maintaining offices and branch locations across Central and South Florida and in Texas.  American Momentum Bank was originally organized under Florida law in 2006 and moved its charter to Texas in 2014.

## JURISDICTION, AND VENUE

33.     This Court has subject matter jurisdiction over this action under 28

U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy

exceeds the sum or value of $5,000,000 exclusive of interests and costs, there are

more than 100 members in the proposed class, and at least one member of the class

is a citizen of a state different from Defendants.

34.     This Court has personal jurisdiction over Defendants Govoni,

Golden, and because these Defendants are citizens and residents of Florida.

35.     This Court has personal jurisdiction over Defendants BAM, BFG,

Prospect Funding, and Prospect III because these Defendants entities are

incorporated and/or have a principal place of business in Florida.

36.     This Court has personal jurisdiction over Defendant Prospect Finance

because Plaintiff and Class Members' causes of action arise from Prospect

Finance's engaging in business in Florida, committing tortious acts in Florida, and

causing injury to persons or property within Florida while engaged in service

activities in this state.

37.      This Court has personal jurisdiction over Defendant American

Momentum Bank because Plaintiff and Class Members' causes of action arise from

American Momentum Bank's engaging in business in Florida, committing tortious

acts in Florida, and causing injury to persons or property within Florida while engaged in service activities in this state.

38.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiff and Class Members' claims occurred in this District.

## GENERAL FACTS APPLICABLE TO ALL COUNTS

### a. The Plaintiffs' and Class Members' Special Needs Trusts

39.     A special needs trusts ("SNT") is a specialized irrevocable trust established for elderly or disabled beneficiaries and typically funded from settlements or recoveries from catastrophic personal injury cases.  In many cases, SNTs are court-ordered trusts to protect the funds recovered attendant to settlements and judgments.

40.     In general, an SNT's purpose is to allow beneficiaries to receive payments from lawsuit settlements or recoveries through distributions from the SNT while continuing to qualify for and receive means-tested public assistance benefits like Medicaid.

41.     Often times, beneficiaries of SNTs are completely and permanently disabled such that apart from public assistance, their only source of income is distributions from the SNT.  This heightened dependency imposes corresponding heightened duties on SNT administrators, including SNT trustees, to safeguard

SNT assets for beneficiaries' use and benefit over the course of their lifetimes.

42.     The grantors of the SNTs are typically the guardians of the primary SNT beneficiary, the disabled individual.

43.     Two common types of SNTs are formed pursuant to federal law. The first are individual, irrevocable SNTs typically established by order of the court overseeing the beneficiary's personal injury case, in accordance with 42 U.S.C. § 1396p(d)(4)(A). The second are pooled SNTs also typically established by court order, in accordance with 42 U.S.C. § 1396p(d)(4)(C).

44.     With pooled SNTs, after a beneficiary agrees to join in the trust, separate sub-accounts are maintained for each beneficiary tracking what assets were contributed to the trust, but trust assets are pooled in a master trust account, which in theory allows for better investment opportunities and lower administrative costs.

45.     Individual irrevocable SNT agreements provide benefits solely to the beneficiary during life.  Upon the beneficiary's death, the remaining trust estate will be distributed in the following order:

   a. First, to pay taxes due specifically because of the beneficiary's death and/or the reasonable fees associated with winding up the trust;

   b. Second, to reimburse all states that had paid medical assistance on the beneficiary's behalf, pursuant to 42 U.S.C. § 1396p(d)(4)(A);

c.  Third, to pay remaining administrative taxes like funeral expenses, remaining taxes, and final medical bills; and

d.  Fourth, to pay the beneficiary's heirs at law.

46.  With pooled SNTs, however, benefits are provided to the beneficiaries during their lives, but any trust estate remaining in the beneficiary's pooled SNT sub-account after the beneficiary's death is deemed surplus trust property and retained by the pooled SNT.  Pursuant to 42 U.S.C. § 1396p(d)(4)(c), in the trustee's absolute and sole discretion, the retained SNT sub-account property will be used for the "direct or indirect benefit of other Beneficiaries," to add indigent disabled persons to the SNT, or to provide equipment or medication to indigent disabled persons. Surplus SNT sub-account assets not retained for those reasons, if any, will be used to reimburse states that had paid medical assistance on the beneficiary's behalf.  A fundamental distinction is that the beneficiaries' heirs at law will not receive any funds remaining deposited into the pooled SNT at the beneficiaries' death.

47.  Plaintiffs and Class Members are grantors and/or beneficiaries of SNTs ("Beneficiaries") administered by the Center, placed their trust in the Center and its founders, officers, directors, and agents to administer the SNTs loyally, prudently, and in good faith.

48.  The Center serves as the trustee and administrator of over 2,000 SNTs across the United States.

49.    Govoni and Staunton founded and incorporated the Center in 2000, serving on its Board of Directors for many years.

50.    The Center was organized as a 501(c)(3) company and maintained that status throughout the relevant time period.

51.    The Center's main business is to serve as the court-appointed trustee for SNTs, a position of utmost trust and fiduciary duty to the Beneficiaries and their families, the country's most vulnerable individuals, who rely directly on government benefits for their long term care.

52.    During its existence, the Center has agreed to serve as the trustee of both individual and pooled SNTs for the Plaintiffs and Class Members.

53.    The Center created individual SNT agreements and retained the services of a law firm owned by Staunton to draft those agreements and represent the Center in negotiating with and entering into the SNTs with the Beneficiaries. Staunton's law firm, Staunton and Faglie, PL, also acted to represent the interests of the grantors of those trusts, typically the guardians of the Beneficiaries. Staunton's law firm would make court appearances to file and present motions to have courts approve the use of SNTs for the Beneficiaries' assets, and under which the Center would then serve as the trustee. Though the conflict of interest was not sufficiently disclosed, Staunton's law firm was paid millions of dollars by the Center since resigning as its director, and was also paid fees to represent the SNT

grantors and Beneficiaries.

54.     To be the trustee of pooled SNTs, the Center was required to create each pooled SNT. To do so, the Center entered into multiple irrevocable master declarations of trust for the SNTs of which it would serve as trustee in various states where the Center did business.  In Florida, for example, the Center entered into a Master Declaration of Trust on March 10, 2001 ("The Florida Pooled Trust") and amended that trust to be effective prospectively and retroactively, on October 22, 2009. The Center acted similarly to maintain pooled SNTs in other states. A Pooled Trust Joinder Agreement is required to participate in the pooled SNT.

55.     In many, if not all, cases, the Center, while serving as the trustee, acted to convert Beneficiaries' interests in their individual and *irrevocable* SNTs to an interest in pooled SNTs by directing the grantors of the original individual SNTs to execute a Pooled Trust Joinder Agreement, but did so without receiving any court approval.

56.     Converting the individual SNTs to pooled SNTs eliminated the Beneficiaries' families' and heirs' remainder interests in trust property upon the Beneficiary's death.  This means, for example, that under a pooled SNT, if the Beneficiary's trust owns personal property, including money, and real estate where the Beneficiary and his parents live together, the Beneficiary's parents will have no right to or interest in that property if the Beneficiary pre-deceases them,

with no regard to the Beneficiary's desire or intent or what a court had approved.

57.     Otherwise, a pooled SNT was used at the outset for the Beneficiary's assets.

58.     As a corporate trustee specializing in SNTs, the SNT Beneficiaries rely on the Center to adhere to its fiduciary duties of care, loyalty, and prudence, had no reason to question the Center's intentions in converting the individual SNTs to pooled SNTs and/or establishing trusts as pooled SNTs rather than individual SNTs initially.

59.     As it turned out, and as detailed below, in order to facilitate a scheme of insider loans, upon information and belief, individual and pooled SNTs were used to misappropriate $100,000,000.00 from SNTs for which the Center was the trustee, with the Defendants acting or causing others to act to harm the Plaintiffs and Class Members.

60.     As alleged above, in the case of individual SNTs, state health care agencies are permitted by law to demand reimbursement for amounts paid during the beneficiary's lifetime. However, pooled SNTs for which the Center was trustee were used to avoid having to reimburse state healthcare agencies for amounts paid during the Beneficiaries' life, and instead retain those funds purported for the direct or indirect benefit of other pooled SNT beneficiaries. Using pooled SNTs would also mean that the Beneficiaries' heirs at law would not have a claim to SNT

assets like they would for individual SNTs, and that the trustee would not be accountable to those heirs.

**b. The Center's Bankruptcy Filing**

61. On February 9, 2024, the Center filed a chapter 11 bankruptcy petition in the Middle District of Florida (Case No. 8:24-bk-00676-RCT) (the "Bankruptcy Case").

62. The Center's bankruptcy petition contained a shocking revelation: over a ten-year span, the Center allowed over $100,000,000.00 million in SNT assets to be siphoned and misappropriated from SNT accounts, unbeknownst to Plaintiffs and Class Members and in violation of the exceptional trust and confidence they had placed in and the duties owed by the Center and its officers, directors, founders, and agents.

63. According to the Center's Case Management Summary filed in the Bankruptcy Case, between 2009 and 2020 approximately $100,000,000.00 in funds were transferred from SNTs under its administration and paid out as a purported loan to Defendant BFG (the "BFG Loan"). Though the Center claims the lending stopped in 2020, the Center has reported that SNTs created after 2020 also have losses.

64. At all relevant times, the Center's founders, Govoni and Staunton, along with Golden, have been BFG's controllers and/or beneficial owners, with

Staunton and Golden being licensed attorneys.

65.     According to the Center's Bankruptcy Case filings, Govoni served on the Center's Board of Directors until late 2008 or early 2009, when he resigned. However, the Center's 2009 Annual Report filed with the Florida Department of State in April of 2009 lists Govoni as one of the Center's directors.  The Center's tax filings state that Govoni served as director until May 20, 2009.

66.     According to the Center, Govoni remained involved with the Center's operations after his resignation.  As alleged further below, he did this through his ownership of companies providing essential information technology, advisement, and SNT accounting services to the Center, and by having individuals in his inner circle, including his daughter and employees and officers of his companies, work as employees and officers of the Center.

67.     Staunton also served on the Center's board until resigning in December 2009, according to the Center's tax filings, but remained involved in and in control of the Center's operations at all relevant times, serving as its outside counsel, registered agent, and authorized representative for certain transactions, including signing SNTs for the Center and acknowledging the receipt of assets into trusts on the Center's behalf.

68.     According to the Center's tax filings, between 2009 and 2021, the Center paid $7,792,118.00 to Staunton's law firm for "legal compliance and

consulting" services.

69.     Govoni's and Staunton's resignations were no doubt a ruse through which they would create the appearance of separation from the Center's operations.

70.     Beginning in 2009, the same year that Govoni and Staunton technically resigned from their director positions (but while they and other Defendants exerted direct control over the Center's day-to-day operations and the SNTs it administered), BFG and its affiliated Defendants misappropriated $100,000,000.00 from SNT accounts maintained at American Momentum Bank, for which the Center was the trustee, through transfers to one or more BFG accounts maintained at American Momentum Bank, purportedly as a loan to BFG identified as a "credit facility."

71.     BFG's principals are the Center's founders, Govoni and Staunton (the latter also the Center's attorney), and Golden (a lawyer the Center alleges worked for and with Govoni for more than 15 years).

72.     Incredibly, the Center states in Bankruptcy Case filings that it has no copies of any loan documents memorializing the alleged BFG Loan, although it admits the loan documents are referenced in an August 2011 letter from BFG to the Center.  The Center also claims it has no records that its Board of Directors or any other party approved the BFG Loan.

73.    Shortly after Govoni and Staunton resigned from their director positions, the Center entered into a purported *interest-only* Revolving Line of Credit Loan Agreement and related $2,500,000.00 Promissory Note, Security Agreement, and Negative Pledge Agreement, each dated as of June 1, 2009, and signed by Govoni for BFG ("Loan Documents").  Staunton signed the June 2009 Loan Documents on behalf of the Center as its managing member.

74.    The Loan Documents were no more than pieces of paper meant to farcically substantiate the impermissible transfers from the SNTs to BFG, which BFG never had any intention of repaying and the Center had no intention of enforcing.  Indeed, the Center did not even file a UCC financing statement to record its purported security interest lien on BFG's assets supposedly pledged as collateral for the so-called loan.

75.    The sham Loan Documents were eventually amended multiple times through on or about January 1, 2012, corresponding to millions of additional dollars misappropriated from SNTs to BFG, including as follows:

a.   December 1, 2009: $15,000,000.00;

b.   March 15, 2010: $30,000,000.00;

c.   March 15, 2011: $50,000,000.00; and

d.   January 1, 2012: $100,000,000.00.

76.    The January 1, 2012 amendments to the purported Loan Documents

were allegedly signed on the Center's behalf by Todd Belisle ("Belisle"), who at the time was the Center's president and a member of its board of directors. However, the Center states in its Bankruptcy Case Management Summary that Belisle does not recall signing BFG Loan documents.

77.     Belisle resigned his employment from the Center effective March 13, 2023.  Upon information and belief, at all relevant times, including while serving as the Center's president and director, Belisle was simultaneously employed with BAM and BFG.

78.     In total, at least $100,000,000.00 was misappropriated from SNT accounts in connection with the sham BFG loan.  A Center bankruptcy filing represents in excess of $105,000,000.00 is presently owed to the SNTs.

79.     BFG and its affiliated Defendants may try to paint the $100,000,000.00 misappropriation of SNT assets as legitimate loans that went bad—an outright preposterous position.    The  so-called  loans  were  *never*  legitimate,  the misappropriated funds were *never* the Center's to give, and the SNT funds should *never* have been transferred to BFG and its affiliated Defendants for their own personal gain.

80.     According to the Center's Bankruptcy Case filings, although the BFG Loan purportedly matured on January 1, 2017, BFG continued to receive funds from the Center and the SNTs until late 2020, and BFG has made no meaningful

attempt to repay the $100,000,000.00 to the SNT accounts the money was siphoned from, only purportedly making periodic interest payments and an alleged small principal reduction payment. Again, the Center reported in the bankruptcy that in excess of $105,000,000.00 is owed to the SNTs.

81.     Astoundingly, the Center claims it just discovered the BFG Loan in April 2022 and attendant depletion of over $100,000,000 SNT assets that had been taking place over a decade-plus period affecting approximately 1,500 SNTs for which the Center served as trustee.

82.     The Center alleges in Bankruptcy Case filings it first became aware of the $100,000,000.00 fraud following Janicki's resignation from her positions with the Center in or around April 2022, when the Center claims it found an unsigned November 11, 2021, letter from BFG to the Center's Board of Directors that Janicki left behind.  Apparently, Govoni sought to modify the terms of the Note and Line of Credit Agreement by extending the maturity date of the Note and reducing the required interest payments, though the loan had long ago matured.

83.     The Center claims that after Janicki's resignation, Govoni tried to take control of the Center first through a proposed management agreement to run the Center's operations, and then through a third-party agreement by which a separate company Govoni controlled would run the Center. The Center claims its Board of Directors rejected both proposals, following which Govoni offered to

become an employee to oversee the Center's operations, for which he should be paid a significant salary, which was also allegedly rejected.

84.     Until filing the Bankruptcy Case in February 2024, the Center gave zero notice to the SNT Beneficiaries of the existence of the Center's loans to BFG or BFG's defaults on those loans, waiting at least 22 months to make any of this public, with apparently no reasonable action having being taken to sue BFG, Govoni, Staunton, Golden, American Momentum Bank, or any other individual or entity involved in the conversion of SNT assets for which the Center is trustee.

85.     In fact, the Bankruptcy Case filings represent that despite knowledge that the purported BFG loan went into default in April 2017, the Center waited well over a year, until August 8, 2023, to have a lawyer send a demand letter to BFG and Govoni to request access to BFG's books and records pursuant to the line of credit agreement and for documents regarding how BFG used the loan proceeds. The letter was ignored. A month later, on September 8, 2023, a lawyer for the first time sent a demand letter for repayment of the $100,000,000.00, which was also ignored and apparently no legal action was taken to compel repayment of the so-called loan.

86.     The Center now blames everyone but itself and its current directors for the massive, unmitigated misappropriation of SNT assets. The Bankruptcy Case filings state that there are 1,570 compromised trusts, whose Beneficiaries are

the Plaintiffs and Class Members in this Action. There is evidence that SNT created after 2020 are also compromised and missing funds.

87.     The Center's entire Board of Directors resigned effective March 13, 2024, and an independent trustee has now been appointed over the Center in the Bankruptcy Case.

88.     A web of corporate entities controlled by Govoni, Staunton, and Golden, including BAM, Boston Settlement Group, FTAS, and Austin Colby Co. ("Austin Colby"), contracted with the Center and were paid handsomely for their purported services.

89.     BAM provided investment management and marketing services for the SNT assets that were purportedly invested via the BFG loan.

90.     Pursuant to a support counsel agreement between the Center and BAM dated March 9, 2001, BAM took over essentially all duties related to SNT assets, including investing and managing SNT assets, marketing and developing SNT trust services in all respects, furnishing personnel for the purpose of providing information about the SNTs, and providing intake and financial counseling services for SNT beneficiaries.

91.     Boston Settlement Group is another entity owned and/or controlled by Govoni, Staunton, and Golden.   Tracey Gregory, an employee of Boston Settlement Group also had a portion of her salary paid by the Center and served

as a board director and accounting manager at the Center from 2008 until she resigned in 2020.

92. FTAS served as the Center's accounting firm to prepare SNT annual accountings to Beneficiaries purporting to show the receipts, disbursements, and inventory of their SNTs, without disclosing the BFG Loan and the subsequent use and failure to repay those funds to the SNTs. According to the Center's tax filings, between 2015 and 2021 the Center paid FTAS over $4,600,000.00 in total. On top of that, FTAS was paid hundreds of thousands of dollars annually with funds taken directly from SNTs.

93. Austin Colby was the information technology provider, maintaining control of the servers on which all documents and data pertaining to each SNT's assets were tracked, and human resources provider, giving BFG, Govoni, Staunton, and Golden, complete control over those employed by the Center, including Gregory Govoni's daughter Caitlin Govoni n/k/a Caitlin Janicki ("Janicki"), who formerly served as the Center's head of case management and vice president.

94. Following the Center's purported first learning of the BFG Loan in April 2022, the Center filed suit against Austin Colby in a Florida state court in June 2022, alleging the Center's access to its servers and data had been cutoff and requesting injunctive relief. After Austin Colby asserted counterclaims, the parties

entered into an October 2022 settlement, the terms of which the Center has made public in one of its Bankruptcy case filings.  The Center agreed to pay $12,500.00 to Austin Colby, in exchange for access to electronically stored information, including Center employee email accounts, which the Center now alleges was never completely provided by Austin Colby in breach of the settlement; the transfer of the Center's telephone numbers and website URLs; and the transfer of Austin Colby's personal property, including what is generically described as Govoni's personal property and a safe he owned with no apparent requirement that an inventory be given to the Center of the personal property and safe contents. The Center also agreed to ensure necessary actions were taken to return leased premises in a condition that would result in the return of a security deposit apparently paid to a landlord by Boston Asset Management, which is also owned and/or controlled by Govoni and Golden, and probably Staunton as well.  The leased premises must have been subleased to the Center or possibly Austin Colby, with Boston Asset Management, not the Center, receiving the security deposit funds.  Despite being aware of who owned and controlled Austun Colby, the Center released Austin Colby and each of its shareholders, officers, directors, members, managers, general or limited partners, parent, subsidiary or affiliated entities, insurers, attorneys, employees, servants, agents, heirs, successors and assigns, of and from any claims, demands, damages, obligation, liability or

25

responsibility of any kind whatsoever arising out of or related to that litigation and the claims brought therein.

### c. The Flow of Misappropriated SNT Assets Through American Momentum Bank

95.    For the most part, the SNT funds are maintained in and were transferred to BFG from, upon information and belief, pooled SNT accounts located at American Momentum Bank.

96.    During the relevant period, BFG also maintained at least one bank account at American Momentum Bank, allowing the $100,000,000.00 in BFG Loan funds to be transferred from the pooled SNT accounts to one or more BFG accounts at the same bank.

97.    From there, BFG would transfer the funds originating from the SNT accounts as purported loans to affiliated entities or other third parties.

98.    American Momentum Bank knew BFG received $100,000,00.00 of SNT assets, yet did nothing to question or stop the misappropriating transfers.

99.    An example of BFG's transfer of Beneficiaries' assets, confirmed via public court filings, is that on or about May 17, 2011, BFG transferred $8,000,000.00 to Prospect Funding for a purported line of credit backed by a promissory note made from Prospect Funding to BFG ("Prospect Loan").

100.    Prospect Funding is owned and controlled by BFG, Govoni, Staunton, and Golden, and was formed less than one week before the Prospect Loan was

made, on May 11, 2011.  Prospect Funding's Articles of Incorporation filed with the Florida Department of State upon its formation listed BFG as its managing member, with Golden signing as the member's authorized representative.

101.   On May 16, 2011, Prospect Funding filed an amended Articles of Incorporation changing the company from member-managed to manager-managed, with BFG now listed as its manager.  The change allowed Prospect Funding to avoid disclosing any member's identity in future annual reports filed with the Florida Department of State.

102.   Upon information and belief, at all relevant times including when it made the Prospect Loan, Prospect Funding's sole member was BFG.

103.   Upon information and belief, at all relevant times including when BFG made the Prospect Loan, Govoni, Staunton, and Golden beneficially owned and controlled Prospect Funding through their interests in BFG, and acted for and on behalf of both Prospect Funding and BFG as the companies' members, representatives, and agents.

104.   At some point between May 2011 and August 2016, the total amount outstanding on the Prospect Loan had increased to approximately $14,000,000.

105.   Prospect Funding purportedly intended to use the Prospect Loan proceeds to finance its affiliate Prospect Finance's investments in personal injury claims through pre-settlement and/or judgment litigation funding.  Prospect

Finance would provide cash advances to plaintiffs in exchange for an interest in the plaintiffs' claims, by which it would be repaid if and when the plaintiffs collected. Prospect Funding would then ostensibly use the payments Prospect received from successful claims to repay the Prospect Loan. The Prospect Loan was secured by an assignment of Prospect Finance's litigation funding investment portfolio.

106.   By August 2016, BFG had sold approximately $7,600,000 of the $14,000,000 Prospect Loan debt to other factors.

107.   Soon after it transferred the initial $8,000,000 to Prospect Funding, BFG began selling off its interest in the Prospect Loan to third party factors. However, BFG remained the Prospect Loan agent and administrator and continued to collect fees for that role.

108.   According to court filings in a lawsuit against BFG by Arena National Finance, LLC and affiliated entities (collectively, "Arena"), in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida, Case No. 20-CA-002356, in or around December 2015 Arena purchased $10,000,000 of the Prospect Loan debt from BFG, memorialized through a participation agreement.

109.   According to Arena's pleading, BFG initially told Arena that the value of the Prospect Finance portfolio in June 2016 was $26,648,947, which restated the portfolio's true value by over $10 million. The estimated value of the Prospect

Finance portfolio as of October 2021 was just $3 million, compared to the over $20 million overdue and outstanding on the Prospect Loan at the time.

110.   Prospect Funding defaulted on tens of millions of dollars in repayments owed under its loan agreement with Arena, prompting Arena to sue Prospect Funding, Prospect Finance, Prospect III, and BFG.  The Arena lawsuit remains pending.

111.   Arena was not the only victim of the Prospect Loan scheme.  In or around August 2016, BFG approached Bridgeview Bank (now First Midwest Bank) ("Bridgeview") to propose that Bridgeview purchase BFG's remaining interest in the Prospect Loan debt.

112.   As part of Bridgeview's due diligence related to BFG's proposal, on or about January 4, 2017, BFG provided Bridgeview with a Portfolio Summary of the Prospect Loan collateral (the claim investments) ("Prospect Portfolio"), which stated that the estimated resolution value of Prospect's portfolio was $28,537,010 — over twice the remaining outstanding balance of the Prospect Loan.

113.   Soon thereafter, Bridgeview agreed to purchase $5,000,000 of BFG's interest in the Prospect Loan debt, which BFG and Bridgeview memorialized in a participation agreement dated January 25, 2017.

114.   After Bridgeview did not receive its expected return on its investment based on the Portfolio Summary furnished by BFG, Bridgeview discovered BFG

had severely undervalued the true collectability of most cases in the Prospect

Portfolio.  On or about June 3, 2019, Bridgeview sued BFG in the United States

District Court for the Middle District of Florida in the case styled *First Midwest*

*Bank v. BFG Investment Holdings, LLC*, Case No. 8:19-cv-01339-TPB-AEP.

115.   Bridgeview alleged the following with respect to BFG and the

Prospect loan (with emphasis added):

> BFG knew that a significant amount of the cases supporting the
> [Prospect] Loan were lost or otherwise uncollectable.
> Notwithstanding the representations made in the Proposal Letter and
> through the Due Diligence Materials, the Loan had many collections
> issues at the time the Due Diligence Materials were provided to
> Bridgeview.
> . . .
> In reality, and known to BFG, a significant amount of the Collateral
> *had been and remained uncollectable for years*.
> . . .
> Plaintiff put forth into evidence 25 certified orders ("Orders") from
> various cases that made up the Collateral portfolio. The Orders
> consist of dismissals of Plaintiffs actions, both with and without
> prejudice. Strikingly, these Orders were entered as far back as 2012,
> yet the cases were still represented to be collectable and valuable as
> per the Portfolio Summaries, *despite having been resolved years prior*.

116.   Through the Prospect Loan factoring scheme, BFG, Govoni, Staunton,

and Golden were able to transfer the SNT funds to BFG's affiliate Prospect as a

purported loan, knowing the debt would not be repaid, and then sell its interest in

the uncollectable Prospect Loan debt in exchange for millions of dollars in cash

from unsuspecting investors—all while owing $100 million to the SNTs for the purported BFG Loan.

117.    In addition, BFG used the BFG Loan funds siphoned from the Center's SNTs to directly make high interest loans to struggling entities not under BFG's control, with little chance of recovery.

### d.  The American Momentum Bank Accounts and its Duties

118.    According to recent filings in the Center Bankruptcy Case, the Center maintains nine pooled SNT bank accounts that receive funds from various investment accounts holding the pooled SNT investments.  The Center makes distributions to Beneficiaries' SNT sub-accounts from the nine pooled SNT accounts.

119.    Eight of the nine SNT accounts are located at American Momentum Bank, and one is at Key Bank.  According to the Center's Bankruptcy Case filings, the SNT accounts and sub-accounts that have been compromised and now have a shortfall of funds due to the BFG Loan were located at American Momentum Bank.

According to the Center's Bankruptcy Case filings, the Center is one of the largest SNT administrators in the country.  As the majority of SNT assets under the Center's administration are in American Momentum Bank's custody, it follows that American Momentum Bank is one of the largest SNT custodians in the country as well.

120.    Checks and electronic deposits were sent to fund the Beneficiaries' SNTs for which the Center served as trustee using a deposit system installed by American Momentum Bank, for which the Center paid a monthly fee to American Momentum Bank.  Structured settlement payments to Beneficiaries were also deposited directly into pooled SNT accounts using the American Momentum Bank deposit system.

121.    The Center also maintains two operating accounts at American Momentum Bank.

122.    Upon information and belief, American Momentum Bank possessed the trust documents establishing individual and pooled SNTs with assets in American Momentum Bank's custody and thus, knew that the SNT account assets were held in trust for Beneficiaries.

123.    American Momentum Bank also knew that other than the Center's two operating accounts, the accounts the Center opened at American Momentum Bank were SNT accounts because each SNT sub-account account designated the specific Beneficiary's SNT as "account holder."  For example, Clark Chamberlin's SNT sub-account at American Momentum Bank designated the Clark Chamberlin Special Needs Trust as account holder.

124.    The trust funds deposited into the SNT accounts at American Momentum Bank were and are required to be segregated and applied to

particular, defined purposes—prudent investments and/or payment of the Beneficiaries' expenses—and thus, constitute special deposits.

125.   Unlike general bank deposits, where the relationship between American Momentum Bank and depositor would be that of debtor and creditor, the special deposits into SNT accounts gave rise to a trustee-beneficiary relationship between American Momentum Bank and SNT Beneficiaries, which obligated American Momentum Bank to ensure said SNT account assets were applied only to the particular, designated purposes for said funds.  Failure to do so constitutes a breach of trust to the Beneficiaries who owned specially deposited SNT assets.

126.   At all relevant times, American Momentum Bank knew the funds deposited into a Beneficiary's SNT account, which explicitly designated the account holder as "[Beneficiary] Special Needs Trust," were special deposits held in trust for Beneficiaries.

127.   Accordingly, by allowing and indeed, facilitating the transfers of SNT funds to BFG, which was not one of the particular purposes for which such SNT assets were to be applied, American Momentum Bank breached its duties of care owed to the SNTs and Plaintiffs and Class Members who owned them.

128.   Additionally, the Florida Trust Code prohibits the use of trust assets to pay for administrative expenses that are unreasonable in relation to the trust

property, the purposes of the trust, and the skills of the trustee. Thus, payment of unreasonable expenses is a misapplication of specially deposited SNT funds.

129.   SNT funds held in trust at American Momentum Bank were used to pay unreasonable expenses, specifically including thousands of dollars, if not more, in recurring payments from each SNT account to FTAS, which payments were in addition to the over-$4,600,000.00 that the Center paid to FTAS between 2015–2021, for the same exact purpose.

130.   Accordingly, by allowing and indeed, facilitating the unreasonable expense payments from SNT accounts to FTAS, which was not one of the particular designated uses of such SNT assets, American Momentum Bank breached its duties of care owed to the SNTs and their Beneficiaries.

131.   Upon information and belief, and as evidenced by documents filed in the case styled *Lee Guardianship Services Inc., et al. v. The Center for Special Needs Trust Administration Inc.*, Case No. 18-007137-CI (Oct. 31, 2018) (a former beneficiaries' lawsuit against the Center based on inadequate accounting and depletion of pooled SNT assets at American Momentum Bank), American Momentum Bank compiles and maintains monthly account statements for each Beneficiary's distribution SNT account, which list the beginning balance, deposits, disbursements, and ending balance of the SNT account for a given month.

132.   Upon information and belief, the American Momentum distribution

account statements are not compiled automatically but rather, with input from American Momentum Bank employees.  This is evidenced by, for example, documents filed the *Lee Guardianship Services Inc.* lawsuit, which show that American Momentum Bank provided two versions of the beneficiary-plaintiff's distribution account statement for the same month (one statement listing deposits from the beneficiary's pooled SNT sub-account that did not appear in the other). Accordingly, American Momentum Bank knew through preparing the SNT account statements that recurring and impermissible payments were being made from SNT accounts to FTAS and that SNT account funds were impermissibly sent to BFG, another American Momentum Bank account holder.

133.    On top of these functions, American Momentum Bank was expressly appointed as a "custodial trustee" in certain SNT agreements among American Momentum Bank, the Center, SNT grantors, and SNT Beneficiaries.

134.    Federal law and regulation require American Momentum Bank to obtain, verity, and record information about the individuals that own and control legal entity customers, referred to as "beneficial owners."  *See* 31 CFR § 1020.210; 31 CFR § 1010.230(d).

135.    Pursuant to 31 CFR § 1010.230(d), a bank must identify and verify the identity of any individual "with significant responsibility to control, manage, or direct a legal entity customer," or "who performs similar functions."

136.    At all relevant times, Govoni had responsibility to control, manage, and direct the Center, by virtue of his overlapping roles as (a) a principal of BAM, to which the Center contracted out essentially all duties related to SNT assets, (b) a principal of Austin Colby, which at all relevant times provided information technology, human resources, and administrative and advisement services under contract with the Center, (c) a principal of FTAS, which since on or before 2015 has purportedly provided accounting services to SNTs and the Center, and (d) the Center's founder and director through May 2009.

137.    Accordingly, upon information and belief, when the Center opened SNT accounts at American Momentum Bank, the bank was informed that Govoni was an individual with control over the Center.

138.    BFG also maintains at least one bank account at American Momentum Bank, such that the BFG Loan funds were transferred from American Momentum Bank SNT accounts to one or more BFG American Momentum Bank accounts. Though not yet confirmed from any publicly available information, it is reasonable to infer that Prospect Funding and Prospect Finance also maintained one or more accounts at American Momentum Bank, to which BFG transferred assets taken wrongfully from the SNTs.

139.    At all relevant times, Govoni owned and had responsibility to control, manage, and direct BFG and through BFG, its subsidiaries Prospect Funding and

Prospect Finance.

140.    Accordingly, upon information and belief, when BFG, and likely, Prospect Funding and Prospect Finance, opened accounts at American Momentum Bank, they informed the bank that Govoni was an individual with ownership and control over these entities.

141.    Thus, American Momentum Bank had actual knowledge that the same individual with control over the Center and SNT accounts under its administration also owned and controlled BFG and Prospect.

142.    At all relevant times, the SNTs in American Momentum Bank's custody were and are American Momentum Bank's customers.

143.    Pursuant to federal banking regulations, "customer" means "a person that opens a new account" with a bank.  31 C.F.R. § 103.121(a)(3)(1)(A).  A trust is a "person." 31 CFR § 1010.100(mm).   "Account" includes "a relationship established to provide a safety deposit box or other safekeeping services, or cash management, custodian, and trust services."  31 C.F.R. § 103.121(a)(1)(i).

144.    The Federal Financial Institutions Examination Council ("FFIEC") *Bank Secrecy Act (BSA)/Anti-Money Laundering (AML) Examination Manual* ("BSA/AML Manual") affirms that "[i]n the case of a trust account, **the customer**

**is the trust** whether or not the bank is the trustee for the trust."[1]

145.     Accordingly,   because   American   Momentum   Bank   provides safekeeping, cash management, and custodian services to Beneficiaries' SNTs, the SNTs and Beneficiaries are customers of American Momentum Bank.

146.     The Federal Deposit Insurance Corporation ("FDIC") has published a Trust Examination Manual applicable to banks conducting trust activities, like American Momentum Bank, which reflects certain standards of care governing banks conducting trust activities.[2]

147.     Among these are "standards for the acceptance of new business in order to control potential risks," which include (a) purpose of the account, (b) identity of principals and beneficiaries, (c) existence of, or potential for, conflicts of interest, (d) composition and nature of assets, (e) existence of administrative problems, and (f) profitability.   Accordingly, for each SNT account opened at American Momentum Bank, American Momentum Bank was obligated to comply with these standards.

148.     Either American Momentum Bank (a) followed its obligations related to the opening of SNT accounts and actually knew that (i) the SNT accounts contained SNT assets, (ii) the SNTs were established for disabled Beneficiaries, (iii)

---

[1] https://bsaaml.ffiec.gov/docs/manual/BSA_AML_Man_2014_v2_CDDBO.pdf, at 248.

[2] https://www.fdic.gov/regulations/examinations/trustmanual/.

an actual conflict of interest existed between the Center's duty as trustee and BAM's role as the SNT accounts' manager, (iv) the SNT accounts held assets in trust for Beneficiaries' benefit, and (v) the SNT account assets must be invested prudently to safekeep the res and provide a stable investment return; or (b) disregarded its account opening due diligence obligations such that it was willfully blind to these facts.

149.   The BSA/AML Manual also sets forth standards of care related to a bank's account, customer, and transaction monitoring duties, which are commensurate with the risk associated with a customer or account.[3]

150.   As set forth in the BSA/AML Manual, banks conducting trust activities, like American Momentum Bank, must assess trust account risks based on a variety of factors including the type of trust account and its size, the types and frequency of transactions, and transactions that are not usual and customary for the customer. The BSA/AML Manual specifically identifies accounts related to non-profits, like the SNT accounts opened by the Center, as an exemplar situation of when enhanced due diligence is appropriate.[4]

151.   The SNT accounts in American Momentum Bank's custody presented multiple factors that made the accounts high risk and triggered American

---

[3] *Id.*

[4] *Id.*

Momentum Bank's enhanced due diligence obligations with respect thereto. These presented risks include the fact that the SNTs were and are statutory *special needs trusts* established for disabled Beneficiaries (which American Momentum Bank knew); the SNT accounts were opened by the Center, a non-profit (which American Momentum Bank knew); the SNT accounts were managed by Govoni through BAM, an insider of the Center (which American Momentum Bank knew); the SNT accounts were frequently being used for atypical transactions, *i.e.*, as BFG's de-facto checking account (which American Momentum Bank knew); such transactions caused the SNT accounts to have a chronic shortfall of funds (which American Momentum Bank knew); and over a relatively short period of time $100,000,000.00 hundreds of millions of dollars was sent from the SNT accounts to BFG's account(s) at American Momentum Bank that Govoni also controlled and thus, constituted an impermissible conflict of interest and breach of fiduciary duties owed to SNTs and the Plaintiffs and Class Members who owned them (which American Momentum Bank knew).

152.   Based on its substantial and intricate dealings with BFG and its affiliated Defendants, American Momentum Bank *had to* have known its customers—and knew its customers were involved in shady transactions.  And American Momentum Bank almost certainly made a substantial profit from its relationship with BFG and its affiliated Defendants, which is why it allowed those

shady transactions to continue.

153.    Indeed, American Momentum Bank was established in 2006 and thus in near infancy when the $100,000,000 in transfers from SNT accounts to BFG took place, such that the misappropriated SNT funds constituted a substantial percentage of *all* assets on deposit at American Momentum Bank.  The only reasonable inference is that American Momentum Bank was fully aware of these misappropriating self-dealing transactions.

154.    Pursuant to the BSA/AML Manual, "[s]tringent documentation, verification, and transaction monitoring procedures should be established for accounts that management considers as higher risk."[5]

155.    The BSA/AML Manual further provides that based on a bank's risk assessment of its trust relationships, the bank shall "[r]eview account statements and, as necessary, specific transaction details," "[c]ompare expected transactions with actual activity," and "[i]dentify any unusual or suspicious activity."[6]

156.    The Trust Examination Manual also provides that "[r]eviewing [trust] accounts on an ongoing basis offers one of the strongest risk management controls over fiduciary activities. . ..  An account review generally covers the administration of the account (administrative review) and the suitability of the account's assets

---

[5] *Id.*

[6] *Id.*

(investment review)."  Additionally, "prudent risk management *would ensure that administrative reviews are normally performed on all custodial accounts. . . .* Management [of a bank] has the responsibility of ensuring that custodial relationships are being administered in accordance with signed agreements."[7]

157.   The Trust Examination Manual lists "general areas" that should typically receive coverage in a bank's administrative review of trust accounts, regardless of risk level.  These general areas include the following:

> Governing instrument (trust agreement, Will, plan document, indenture, etc.) - Is a copy on file?
>
> Cash transactions - Are remittances, disbursements, and overdrafts posted correctly to income and principal? Is there any evidence of unusual cash flow activity[?]
>
> Is there any suspicion of money laundering? If so, has management filed, or considered filing, a Suspicious Activity Report per FDIC Part 353 – Suspicious Activity Reports.
>
> Securities transactions - Were appropriate approvals and authorizations obtained for nondiscretionary and discretionary transactions? As applicable, were confirmations sent within the prescribed time frames? Did the confirmations or account statements contain the appropriate disclosure documentation?
>
> Accountings and statements - Are they accurate, timely, and provided to appropriate parties?

---

[7] https://www.fdic.gov/regulations/examinations/trustmanual/section-01/section-01.pdf (emphasis added).

Commissions and fees - Are they accurate, consistent with the established fee schedule, and being collected? Have any exceptions been appropriately approved?[8]

158.    Additionally, the Trust Examination Manual provides that banks "must be wary of trusts being used for fraudulent transfers."[9]

159.    In other words, both the BSA/AML Manual and the Trust Examination Manual affirm American Momentum Bank's ongoing duty to review SNT accounts and monitor SNT account transactions.  American Momentum Bank could not just hide its head in the sand as Govoni and other Defendants affiliated with him used the bank as a conduit for their $100,000,000 misappropriation of assets its customers, the SNTs, in the face of its duties under federal law, regulations, and basic industry standards.

160.    In addition, the Trust Examination Manual recognizes a bank's duty to prevent unauthorized commingling of trust assets (with emphasis added):

[U]nless specifically permitted by law, assets of each fiduciary account *should be kept separate from both the assets of other fiduciary accounts and the assets of the bank*. In carrying out this responsibility, *the bank should identify all assets with the name of the fiduciary account* . . . . If the bank is acting in an agency or custodial capacity, registration would be in the name of the principal, unless otherwise directed or authorized by the governing agreement.[10]

---

[8] *Id.*

[9] https://www.fdic.gov/regulations/examinations/trustmanual/Section_4/section_iv.html#tocc4a.

[10] https://www.fdic.gov/regulations/examinations/trustmanual/section_8/section_viii.html (emphasis added).

161.    As follows, American Momentum Bank owed a duty to identify all SNT account assets ensure that those assets in SNTs' special purpose fiduciary accounts were kept separate from American Momentum Bank's own assets, which included funds in BFG's general-deposit American Momentum Bank account. Instead of complying with this obligation, it knowingly facilitated the improper transfers of $100,000,000.00 SNT assets from SNT accounts to BFG's general account at American Momentum Bank, commingling those SNT assets with the bank's own property.

162.    Moreover, pursuant to § 658.12, Florida Statutes, applicable to banks and trust companies, a "custodian . . . of a person, property, or an estate" is a "fiduciary" with regards to said property.   Thus, the relationship between American Momentum Bank and the SNTs in its custody was not merely that of bank and customer but instead, one in which American Momentum Bank was the SNTs' fiduciary.

163.    Additionally, pursuant to § 825.101(12), Florida Statutes, one "who has been entrusted with or has assumed responsibility for the use or management of [a] . . . disabled adult's funds, assets, or property" holds a "position of trust and confidence" with respect to the disabled adult.  So to the extent that individual or pooled SNT Beneficiaries were or are adults, American Momentum Bank owed additional implied fiduciary duties to those Beneficiaries.

164.    Additionally, American Momentum Bank owed the SNTs and Beneficiaries fiduciary duties as an agent of the Center, the SNTs' trustee.

165.    As the Trust Examination Manual acknowledges, a bank acting as a trustee's agent can give rise to the bank's fiduciary relationships vis-à-vis trust property.  Such trust-agency relationships include a bank serving as custodian of trust property with the "duties of safekeeping property and performing ministerial acts, as directed by the principal."[11]

166.    Likewise, pursuant to § 660.36, Florida Statutes, when a trust company, like the Center, employs another entity, like American Momentum Bank, to perform "any act of administration, whether or not discretionary" with respect to a trust, the entity "serving as such agent shall observe the same standard of care as is required of the principal fiduciary trust company or trust department with respect to each fiduciary account or other relationship affected by such agency."

167.    Section 736.0807, Florida Statutes, reiterates that "[i]n performing a delegated function, an agent owes a duty to the trust to exercise reasonable care to comply with the terms of the delegation."

168.    As evidenced by the fact that SNT assets were held in American

---

[11] https://www.fdic.gov/regulations/examinations/trustmanual/Section_4/section_iv.html#tocc4a

Momentum Bank's custody, and that American Momentum Bank performed, at least, administrative and ministerial acts related to those SNT accounts pursuant to the Trust Cash Management System arrangement with the Center, American Momentum Bank acted as the Center's agent and thus, assumed fiduciary duties with regards to SNT assets in its custody and the Plaintiffs and Class Members who owned them.

169.   Not only did American Momentum Bank owe the duty to protect SNT assets in its custody; it had actual knowledge that SNT assets were being misapplied, misappropriated, and siphoned away from SNT accounts through impermissible purported expense payments and conflict of interest transactions, the most prominent being the transactions associated with the sham BFG Loan, which in and of itself is a clear breach of fiduciary duties owed to SNTs and Beneficiaries by the Center, by BAM, and by American Momentum Bank itself.

170.   Immediately after commencing the Center Bankruptcy Case, the Center specifically requested authorization from the bankruptcy court to use SNT account funds to reimburse American Momentum Bank for overdrafts or returned checks, indicating issues with respect to insufficient funds in the American Momentum Bank SNT accounts from which SNT assets were wrongfully transferred to BFG. Thus, American Momentum Bank knew that BFG's

misappropriation had led to a chronic shortfall of assets in SNT accounts in its custody.

171.    Additionally, federal law and regulation require banks such as American Momentum Bank to report fiduciary assets in its custody and related fiduciary services conducted by the bank, including "activities that do not require trust powers but are incidental to fiduciary services. Specifically, this includes custodial services for assets held by the institution in a fiduciary capacity"[12]—like the SNT assets in American Momentum Bank's custody.

172.    However, according to the FDIC's public database of bank reports, American Momentum Bank never disclosed to the FDIC that it had custody of *any* SNT assets, falsely reporting that it had no fiduciary accounts.  This allowed American Momentum Bank to evade FDIC trust examinations and audits that would otherwise have been conducted if the SNT accounts in American Momentum Bank's custody were accurately disclosed.

### e.  Plaintiffs' Experience

173.    In 1996, Todd and Kelli Chamberlin married and were unable to conceive children naturally.   In 2008, Todd and Kelli underwent IVF treatment and became pregnant with fraternal twins.   On November 5, 2008, Clark and

---

[12]    *See*    https://www.fdic.gov/resources/bankers/call-reports/crinst-031-041/2007/2007-06-rc-t.pdf.

Sawyer Chamberlin were born in a Palm Beach hospital at approximately twenty-nine weeks gestational age via urgent cesarean section.    The twins were immediately admitted into the Level III NICU and under the care and treatment of the hospital's neonatologists.    The neonatologists noted in the twins' admissions record that Kelli was colonized for *group b streptococcus* (herein after "GBS").  After eighteen days in the NICU, Clark became septic with GBS and then the following day, Sawyer did as well.   Clark also had GBS meningitis that went allegedly undiagnosed and inadequately treated by the medical providers for over four days, which led to a catastrophic brain injury.

174.  On December 30, 2008, Clark underwent a CT scan of the brain on the morning of his discharge, and it was determined Clark had obstructive hydrocephalus by the radiologist.   It was also noted in the radiology report that Clark needed brain surgery in the form of a shunt.   The discharging doctor never reviewed this report or consulted with the radiologist before discharging Clark from the hospital.   Later that afternoon after reviewing the report, the medical providers never informed the parents nor the doctors that were set up for the follow-up care.

175.   On January 6, 2009, Clark underwent brain surgery (right-sided endoscopic third ventriculostomy or "ETV") to relieve the building pressure at Miami Children's Hospital.    In each of the following three months, Clark

48

underwent further brain surgeries (left and right-sided shunting) to further relieve the mounting pressure in the brain at Miami Children's Hospital. As a result, Clark is permanently disabled.

176.   In January of 2011, Todd and Kelli Chamberlin filed a complex medical malpractice suit in Palm Beach County Circuit Court against approximately fifteen different medical providers that provided care and treatment during pregnancy, post-birth hospitalization, and post-discharge follow up (Case No. 50 2011-CA 001460XXXXMB (AO)).  Beginning in March of 2011, Plaintiffs resolved with approximately half of the Defendants and at that time, the Court initially created a guardianship account for the settlement proceeds.  Then in August 2011, the court approved the creation of an irrevocable individual SNT (named and identified in all court filings as: Clark J. Chamberlin Special Needs Trust), pursuant to 42 U.S.C. 1396p (d)(4)(A), for all settlement proceeds for Clark.

177.   Staunton's law firm was engaged to represent Plaintiffs in the creation of the Clark J. Chamberlin Special Needs Trust and to obtain court approval for it, appearing in the guardianship proceeding for that purpose.  On August 18, 2011, Plaintiffs, as grantors, executed the Irrevocable Declaration of Trust, with the Center signing that agreement as the trustee, to manage and oversee the settlement proceeds as the trust's fiduciary.

178.   In January of 2014, the hospital resolved the claims against it, which

resulted in additional funds to be included in the SNT for Clark. In July 2014, the Center directed Plaintiffs to execute a Pooled Trust Joinder Agreement for the Florida Pooled Trust, even though the individual SNT for Clark was irrevocable. Thereafter, assets from prior and subsequent settlements with defendants to the medical malpractice case were placed in the pooled SNT for Clark, including cash, structured settlement payments, real estate, and a vehicle. This includes settlement proceeds in 2016, 2019, and 2020.

## CLASS ACTION ALLEGATIONS

Pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4), Plaintiff brings this action on behalf of himself and on behalf of all members of the proposed Nationwide Class (the "Class") defined as:

> All individuals residing in the United States who are grantors and/or Beneficiaries of SNTs administered by the Center, as the trustee of those SNTs, and affected by monetary transfers to BFG out of one or more SNT trust accounts at American Momentum Bank.

179.   Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

180.   Plaintiff reserves the right to amend the definition of the Class or add

a Class or Sub-class if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

181. **Numerosity**: The Class Members are so numerous that joinder of all members is impracticable, if not completely impossible.  At least 1,570 SNTs were and are compromised due to the transfers to BFG resulting from Defendants' conduct.  The Class is apparently identifiable within Defendants' the Center's records, and the Center has already identified these individuals (as evidenced by sending them Notice Letters in the Center Bankruptcy Case).

182.   Common questions of law and fact exist as to all Class Members and predominate over any questions affecting solely individual Class Members. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, are the following:

a. Whether and to what extent each Defendant had a respective duty to detect, investigate, and inquire into the diversion of pooled SNT assets;

b. Whether and to what extent each Defendant had a respective legal and/or fiduciary duty to prevent pooled SNT assets from being misappropriated and diverted;

c.  Whether and to what extent each Defendant had a respective legal and/or fiduciary duty to promptly notify Class Members when the misappropriation and diversion of SNT assets was discovered;

d.  Whether and to what extent each Defendant owed Class Members a respective legal and/or fiduciary duty to inquire into, detect, prevent, not engage in, and/or warn about the diversion of pooled SNT assets to BFG;

e.  Whether each Defendant's acts to detect, investigate, and inquire into the diversion and misappropriation of SNT assets were reasonable in light of evidence that such diversion and misappropriation was taking place;

f.  Whether each Defendant's acts or omissions to prevent the ongoing diversion and misappropriation of SNT assets were reasonable in light of evidence that such diversion and misappropriation was taking place;

g.  Whether each Defendant acts or omissions to promptly notify Class Members upon discovering the misappropriation diversion of SNT assets to BFG were reasonable in light of confirmation that such misappropriation and diversion was taking place;

h.  Whether each Defendant's failure to detect, investigate, or inquire into the ongoing diversion and misappropriation of SNT assets amounted to negligence;

i.  Whether each Defendant's failure to take reasonable steps to prevent the ongoing diversion and misappropriation of SNT assets amounted to negligence;

j.  Whether each Defendant's failure to detect, investigate, or inquire into the ongoing diversion and misappropriation of SNT assets amounted to a breach of fiduciary duty;

k.  Whether each Defendant's failure to prevent the ongoing diversion and misappropriation of SNT assets amounted to a breach of fiduciary duty;

l.  Whether and to what extent the Center breached its fiduciary duties owed to Class Members;

m. Whether and to what extent each Defendant had knowledge of the Center's breaches of fiduciary duties owed to Class Members;

n.  Whether and to what extent each Defendant substantially assisted in the Center's breaches of fiduciary duties owed to Class Members;

o. Whether Plaintiff and Class Members' SNT assets were converted through the transfers from pooled SNT accounts to BFG;

p. Whether Defendant BFG was unjustly enriched due to the transfers of SNT assets to BFG;

q. Whether Defendants Prospect Funding, Prospect Finance, and Prospect III were unjustly enriched due to the subsequent transfers of SNT assets from BFG to Prospect Funding;

r. Whether the initial transfers of SNT assets to BFG and subsequent transfers of SNT assets to Prospect Funding were made with the intent to hinder, delay, or defraud Class Members; and

s. Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct.

183. **Typicality**: Plaintiff's claims are typical of those of the other Class Members because Plaintiff, like every other Class member, was exposed to virtually identical conduct and now suffers from the same injuries as each other member of the Class, i.e., the diversion and misappropriation of pooled SNT assets.

184. This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class,

thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making uniform declaratory relief appropriate as to the Class as a whole.  Defendants' acts and omissions challenged herein apply to and affect Class Members uniformly and Plaintiff's claims hinge on issues related to Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff:

a.  Whether Defendants Govoni, Golden, and Staunton use BFG, Prospect Funding, Prospect Finance, and Prospect III and as mere instrumentalities, such that they are alter egos of Govoni, Golden, and Staunton.

b.  Whether each Defendant owed a legal and/or fiduciary duty to Plaintiff and the Class to exercise due care to detect, investigate, and inquire into the diversion and misappropriation of SNT assets;

c.  Whether each Defendant owed a legal and/or fiduciary duty to Plaintiff and the Class to exercise due care to prevent the diversion and misappropriation of SNT assets;

d.  Whether Defendants BFG, Govoni, Golden, and Staunton converted Plaintiff and Class Members' SNT assets through the transfers to BFG; and

e.  Whether BFG transferred funds siphoned from pooled SNT accounts to Prospect Funding with the intent to hinder, delay, or defraud creditors.

185.  **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Class Members.  Plaintiff seeks no relief that is antagonistic or adverse to Class Members and the infringement of the rights and the damages he has suffered are typical of other Class Members.  Plaintiff has retained counsel experienced in complex class action and asset recovery litigation, and Plaintiff intends to prosecute this action vigorously.

186.  **Superiority**: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved.  Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that millions of individual actions would require.  Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations like Defendants.  Further, even for those Class Members who could afford to litigate

such a claim, it would still be economically impractical and impose a burden on the courts.

187.   The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage, as they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

188.   Adequate notice can be given to Class members directly using information maintained in the Center's records, which Plaintiff will seek and obtain through discovery.

189.   Further, Defendants have acted and/or failed to act on grounds that apply generally to the Class as a whole, so that class certification and corresponding declaratory relief are appropriate on a class-wide basis.

## CAUSES OF ACTION

### COUNT I: CONVERSION
**Against BFG, Govoni, Staunton, and Golden**

190.    Plaintiffs re-allege and incorporate paragraphs 1–122, 126, 129, 130, 137, 139, 164, 167, 168, and 174–91 above as though set forth fully herein.

191.    Plaintiffs and Class Members entrusted the custody and administration of SNT assets to the Center as Plaintiffs' and Class Members' trustee and fiduciary.

192.    As trustee of the SNTs, the Center is and was obligated to keep SNT assets segregated from its own.

193.    As trustee of the SNTs, the Center is and was obligated to keep each Beneficiary's share of pooled trust SNT distributions segregated in the Beneficiary's sub-accounts.

194.    At all relevant times, each Beneficiary's property, the Beneficiary's share of the pooled trust distributions, was specifically traceable and identifiable through the Center's uniformly applied treasury management system with American Momentum.

195.    At all relevant times, BFG, Govoni, Staunton, and Golden, by virtue of their direct involvement in the Center's founding, operations, and finances as well as in the establishment and administration of Plaintiffs' and Class Members'

SNTs, knew that the SNT property belonged to the Beneficiaries.

196.    At all relevant times, BFG, Govoni, Staunton, and Golden, by virtue of their direct involvement in the establishment and administration of Plaintiffs' and Class Members' SNTs and their experience (including as licensed attorneys) in trust administration, that the Beneficiaries did not authorize the transfer of SNT funds to fund the BFG loan.

197.    At all relevant times, including when BFG, Govoni, Staunton, and Golden's conversion of SNT assets took place, Plaintiffs' and Class Members SNTs have an immediate and exclusive right to the funds that were wrongfully transferred from SNT accounts to fund the purported BFG Loan.

198.    BFG, Govoni, Staunton, and Golden converted for their own use the pooled SNT funds to which Plaintiffs and Class Members had and have an immediate and exclusive right, by causing the funds to be transferred out of the SNT accounts in violation of the trust agreements, the Beneficiaries' permissions, and these Defendants statutory and common law duties of care, prudence, loyalty, and good faith owed to Plaintiffs and Class Members.

199.    When BFG, Govoni, Staunton, and Golden wrongfully transferred the funds from the SNT accounts to BFG's for the purported BFG Loan, these Defendants had no interest in or right to the SNT property that would permit them to transfer or possess it.

200.   BFG, Govoni, Staunton, and Golden have been demanded to return the funds to the SNTs, but these Defendants have refused to do so.

201.   By misappropriating the SNT accounts while all interest in and right to the funds therein belonged to the SNTs and Beneficiaries, BFG, Govoni, Staunton, and Golden have deprived Plaintiffs of their rights to the SNTs and have wrongfully exercised an act of dominion over Plaintiffs' and Class Members' property that is inconsistent with Plaintiffs' and Class Members' ownership thereof.

202.   As the direct consequence of BFG, Govoni, Staunton, and Golden wrongful conversion of the SNT account funds, Plaintiffs and Class Members have been deprived of the SNTs' immediate and exclusive right to the funds and suffered corresponding damages for which these Defendants are jointly and severally liable.

## COUNT II: BREACH OF FIDUCIARY DUTY
**Against Govoni, Staunton, Golden, and Boston Asset Management**

203.   Plaintiffs re-allege and incorporate paragraphs 1–122, 126, 129, 130, 137, 139, 164, 167, 168, and 174–91 above as though set forth fully herein.

204.   At all relevant times, Defendants Govoni and Staunton were the Center's founders and substantial contributors and exerted oversight and control over the Center and the SNTs under its administration.

205.   Additionally, at all relevant times Govoni, Staunton, and Golden had the ability to control SNT account funds through the investment management services they provided under the Center's contract with BAM.

206.   At all relevant times, Govoni, Staunton, and Golden acted in the course and scope of their roles as directors and employees of BAM.

207.   At all relevant times, BAM, the Center's agent, owed fiduciary duties to Plaintiffs and Class Members and their SNT assets under BAM's management.

208.   At all relevant times, as Beneficiaries of the SNTs, Plaintiffs and Class Members reposed trust in Govoni, Staunton, Golden, and BAM to exercise their superior expertise in the handling and investing SNT funds.

209.   By virtue of the imbalance of superiority and vulnerability in these Defendants' relationship with Plaintiffs and Class Members, these Defendants had a special relationship with Plaintiffs and the Class Members giving rise to their heightened, strict, fiduciary duties of care, loyalty, and prudence owed to Plaintiffs and Class Members.

210.   By virtue of their fiduciary relationship to Plaintiffs and Class Members, at all relevant times, these Defendants owed Plaintiffs and Class Members strict fiduciary duties of loyalty, prudency, and good faith.

211.   As the fiduciaries entrusted to handle and invest SNT assets, these Defendants owed Plaintiffs and Class Members the fiduciary duties to administer

and invest the SNTs prudently and reasonably.

212.   At all relevant times, these Defendants knew that their special, fiduciary relationship to Plaintiffs and Class Members gave rise to their heightened, strict, fiduciary duties of care, loyalty, and prudence in handling and investing SNT funds.

213.   These Defendants breached their duties of care, loyalty, and prudence, owed to Plaintiffs and Class Members by engaging in a $100,000,000 self-dealing transaction with no legitimate, reasonable, or prudent purpose.

214.   These Defendants breached their duties of care, loyalty, and prudence, owed to Plaintiffs and Class Members by causing the transfer of over $100,000,000 from SNT accounts to one or more BFG accounts for the purported BFG loan, which was never a reasonable investment, authorized, or repaid to the SNTs.

215.   These Defendants further breached their fiduciary duties of care, loyalty, and prudence by depleting SNT accounts for the improper transfers to BFG, with no prudent or legitimate reason for doing so.

216.   These Defendants further breached their fiduciary duties of care, loyalty, and prudence, by using a web of sham alter ego corporations to carry out their ongoing misappropriation of SNT funds, rather than disclosing their actions to Plaintiffs.

217.   But for these Defendants' breaches of their fiduciary duties owed to Plaintiffs and Class Members as described above, the decade-plus scheme would never have occurred.

218.   As a direct and proximate result of these Defendants' breaches of fiduciary duties owed to Plaintiffs, Plaintiffs and Class Members have been injured, including by the conversion, dissipation, and waste of over $100,000,000 in SNT assets, damages for which these Defendants are jointly and severally liable.

<u>COUNT III: BREACH OF FIDUCIARY DUTY</u>
**Against FTAS**

219.   Plaintiffs re-allege and incorporate paragraphs 1–122, 126, 129, 130, 137, 139, 164, 167, 168, and 174–91 above as though set forth fully herein.

220.   At all relevant times, Defendant FTAS provided accounting services to Plaintiffs' and Class Members' SNTs as the Center's agent.

221.   At all relevant times, FTAS, the Center's agent, owed fiduciary duties to Plaintiffs and Class Members and their SNT assets.

222.   Additionally, at all relevant times, FTAS, the Center's agent, owed fiduciary duties to Plaintiffs and Class Members to ensure that no unreasonable expenses were paid from SNTs.

223.   At all relevant times, Plaintiffs and Class Members reposed trust in FTAS to exercise its superior expertise in accounting for SNT assets.

224.   By virtue of the imbalance of superiority and vulnerability in FTAS's relationship with Plaintiffs and Class Members, FTAS had a special relationship with Plaintiffs and the Class Members giving rise to its heightened, strict, fiduciary duties of care, loyalty, and accounting owed to Plaintiffs and Class Members.

225.   FTAS accepted this delegation of trust and authority from Plaintiffs and Class Members by undertaking to provide accounting services to their SNTs and charging the SNTs directly for such services.

226.   By virtue of its fiduciary relationship to Plaintiffs and Class Members, at all relevant times, FTAS owed Plaintiffs and Class Members strict fiduciary duties of loyalty, prudency, and good faith.

227.   As the fiduciary entrusted to account for SNT assets, FTAS owed Plaintiffs and Class Members the fiduciary duty to account for SNT property accurately and transparently.

228.   As the fiduciary entrusted to account for SNT assets, FTAS owed Plaintiffs and Class Members the additional fiduciary duty not to charge the SNTs unreasonable fees.

229.   At all relevant times, FTAS knew that its fiduciary relationship to Plaintiffs and Class Members gave rise to its heightened, strict, fiduciary duties of care, loyalty, and prudence in accounting for SNT property and charging SNTs.

230.   FTAS breached its duties of care, loyalty, and prudence, owed to Plaintiffs and Class Members by failing to account for the $100,000,000 in self-dealing transactions that had no legitimate, reasonable, or prudent purpose and involved unambiguous conflicts of interest.  FTAS, an entity controlled by Govoni and Golden, was incentivized to not be transparent with Plaintiffs and Class Members so that they would not know of the rampant misappropriation of SNT assets.

231.   FTAS further breached its duties of care, loyalty, and prudence, owed to Plaintiffs and Class Members by charging thousands of dollars in fees to each SNT while simultaneously receiving over $4,600,000.00 from the Center in a five-year period, which fees were unreasonable due to the woefully inadequate accounting that FTAS provided, which obfuscated the impermissible misappropriation of over $100,000,000 from SNT accounts.

232.   But for FTAS's breaches of its fiduciary duties owed to Plaintiffs and Class Members as described above, the over-decade-long scheme and corresponding misappropriation of SNT assets would never have occurred.

233.   As a direct and proximate result of FTAS's breaches of fiduciary duties owed to Plaintiffs, Plaintiffs and Class Members have been injured, including by the conversion, dissipation, and waste of over $100,000,000 in SNT assets, damages for which FTAS is liable.

## COUNT IV: BREACH OF FIDUCIARY DUTY
**Against American Momentum Bank**

234.     Plaintiffs re-allege and incorporate paragraphs 1 through 191 above as though set forth fully herein.

235.     At all relevant times, Plaintiffs' and Class Members' SNTs were American Momentum Bank's customers.

236.     Plaintiffs and Class Members entrusted the custody of SNT accounts to American Momentum Bank as Plaintiffs' and Class Members' fiduciary.

237.     At all relevant times, as Beneficiaries of the SNTs, Plaintiffs and Class Members reposed trust in American Momentum Bank to exercise its superior expertise in serving as custodian of SNT accounts.

238.     At all relevant times, American Momentum Bank knew that the pooled SNT accounts maintained at its location were SNTs and that it owed the attendant heightened fiduciary duties of care, loyalty, prudence, and good faith to the SNTs and Plaintiffs.

239.     American Momentum Bank accepted this delegation of trust and authority from Plaintiffs and Class Members by undertaking to provide custodial, administrative, and ministerial services to their SNTs.

240.     By virtue of the imbalance of superiority and vulnerability in American Momentum Bank's relationship with Plaintiffs, American Momentum

Bank and Plaintiffs and Class Members had a special relationship giving rise to American Momentum Bank's heightened, fiduciary duties of care owed to Plaintiffs.

241.   Additionally, the SNT assets in American Momentum Bank's custody were special deposits to be applied only for the particular, designated purposes of prudent investments and payments of Beneficiaries' expenses, making American Momentum Bank the custodial trustee over those SNT assets with corresponding fiduciary duties to Plaintiffs and Class Members.

242.   Additionally, at all relevant times American Momentum Bank as the Center's agent owed fiduciary duties to Plaintiffs and Class Members to safeguard the SNT assets in its custody.

243.   By virtue of its fiduciary relationship to Plaintiffs and Class Members and their SNTs assets in its custody, at all relevant times, American Momentum Bank owed Plaintiffs and Class Members strict fiduciary duties of loyalty, prudence, and good faith.

244.   At all relevant times, American Momentum Bank owed Plaintiffs and Class Members a fiduciary duty to "know its customer" and conduct reasonable due diligence commensurate with evaluated risk with regard to the opening and use of accounts in its custody, to ensure that SNT accounts were not being used for improper purposes or to benefit persons or entities that were not entitled to

such benefit.

245.    As the SNTs' custodian and Plaintiffs' and Class Members' fiduciary, American Momentum Bank owed Plaintiffs and Class Members the fiduciary duties to ensure that the SNT accounts in its custody were administered, inspected, and invested prudently and reasonably.

246.    At all relevant times, American Momentum Bank knew the $100,000,000 in transfers from SNT accounts in its custody to BFG's account at American Momentum Bank constituted impermissible, conflict of interest transactions and it would breach its fiduciary duties of care, prudence, and good faith by facilitating those transfers.

247.    At all relevant times, American Momentum Bank knew it would be in breach of its fiduciary duties of care, prudence, and good faith by allowing SNT funds to be commingled with its own assets in the Center's master or operating general-deposit accounts at American Momentum Bank and/or BFG's general deposit account at American Momentum Bank.

248.    At all relevant times, American Momentum Bank had the obligation and ability to inspect and uncover the misappropriation of SNT account by virtue of its custody over these accounts and corresponding laws, regulations, and industry standards alleged above.

249.    Any reasonable bank in American Momentum Bank's position

adhering to its fiduciary duties to know its customer and conduct reasonable due diligence with respect to accounts and assets in its custody would have detected the impropriety of the $100,000,000 in transfers from SNT accounts to the BFG account maintained by individuals who themselves owed fiduciary duties of loyalty, care, and prudence to Plaintiffs and Class Members.

250.  American Momentum Bank breached its fiduciary duties of care, loyalty, prudence, and protection of SNT assets owed to Plaintiffs and Class Members by facilitating the intrabank transfers of $100,000,000 in SNT assets to BFG, knowing such transfers involved BFG's impermissible conflict of interest and constituted a misappropriation and misuse of SNT assets, and that BFG had not and would not repay the SNTs.

251.  In the alternative, American Momentum Bank breached its duties of care, loyalty, prudence, and protection of SNT assets owed to Plaintiffs and Class Members by failing to conduct reasonable due diligence to detect that BFG was controlled by the same individuals that had power to handle and invest funds in the SNT accounts, such that the over $100,000,000 transferred from SNT accounts went to insiders of the Center through unauthorized and improper self-dealing transactions.

252.  American Momentum Bank further breached its duties of care, loyalty, and prudence owed to Plaintiffs and Class Members by facilitating such

transactions in the midst of overdraft and/or returned check issues related to SNT accounts in its custody, without conducting further due diligence into the propriety of such transactions whole those issues were present.

253.   Had American Momentum Bank adhered to its fiduciary duties owed to Plaintiffs and Class Members, it would have blocked and alerted about the $100,000,000 misappropriation from SNT accounts in its custody, rather than facilitating those transfers time and time again.

254.   Had American Momentum Bank adhered to its fiduciary duties to Plaintiffs and Class Members, it would have discerned and/or alerted that there were no corresponding returns generated by the $100,000,000 in transfers flowing out of the SNT accounts over more than a decade and that the only money coming into the pooled SNT accounts was from new Beneficiaries' accounts.

255.   But for American Momentum Bank's breaches of its fiduciary duties owed to Plaintiffs and Class Members as described above, the decade-plus scheme would never have occurred and the resulting harm to Plaintiffs and Class Members would have been prevented.

256.   As a direct and proximate result of American Momentum Bank's breaches of fiduciary duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members have been injured, including by the conversion, dissipation, and waste of over $100,000,000 in SNT assets.

## COUNT V: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### Against Govoni, Golden, Staunton, and BFG

257.    Plaintiffs re-allege and incorporate paragraphs 1 through 191 above as though set forth fully herein.

258.    Plaintiffs and Class Members entrusted the administration of SNT assets to the Center, as the SNTs' and Plaintiffs' and Class Members' trustee and fiduciary .

259.    At all relevant times, Plaintiffs and Class Members reposed trust and confidence in the Center to exercise its superior expertise in serving as trustee and administering SNT property.

260.    Additionally, Plaintiffs and Class Members entrusted the management and investment of SNT assets to BAM, as the Center's agent and the SNTs' and Plaintiffs' and Class Members' investment manager and fiduciary.

261.    At all relevant times, Plaintiffs and Class Members reposed trust and confidence in BAM to exercise its superior expertise in serving as the SNTs' investment manager and the Center's agent and in managing SNT property.

262.    By virtue of the imbalance of superiority and vulnerability in the Center's relationship with Plaintiffs, the Center and Plaintiffs and Class Members had a special relationship giving rise to the Center's heightened, fiduciary duties of care, loyalty, and prudence owed to Plaintiffs.

263.    Similarly, by virtue of the imbalance of superiority and vulnerability in BAM's relationship with Plaintiffs, BAM and Plaintiffs and Class Members had a special relationship giving rise to BAM heightened, fiduciary duties of care, loyalty, and prudence owed to Plaintiffs and Class Members.

264.    As the SNTs' trustee, the Center owed Plaintiffs and Class Members the fiduciary duties to administer, inspect, and invest SNT property prudently and reasonably.

265.    As the SNTs' investment manager and the Center's agent, BAM owed Plaintiffs and Class Members the fiduciary duties to administer, manage, and invest SNT property prudently and reasonably.

266.    At all relevant times, Defendants Govoni, Golden, Staunton, and BFG knew that the Center and BAM owed strict duties of care, loyalty, and prudence to the SNTs and Plaintiffs.

267.    At all relevant times, these Defendants knew that the Center and BAM would be in breach of their duties of care, prudence, and good faith by allowing and/or causing SNT funds to be misappropriated and diverted to fund the sham BFG loan.

268.    At all relevant times, these Defendants knew that the Center and BAM would be in breach of their duties of care, prudence, and good faith by

allowing and/or causing SNT accounts to be almost completely depleted through transfers to BFG.

269.   At all relevant times, these Defendants had actual knowledge, by virtue of their control over the Center, BAM, and BFG, that the Center and BAM were in breach of their fiduciary duties of care, loyalty, and prudence owed to the SNTs and Plaintiffs and Class Members by allowing and/or causing over $100,000,000 to be improvidently transferred from SNT accounts to BFG undetected by Plaintiffs and Class Members for more than a decade through transactions involving clear conflicts of interest.

270.   The Center and BAM further breached their duties of care, loyalty, and prudence owed to Plaintiffs and Class Members by allowing and/or causing over $100,000,000 to be transferred to BFG from the SNT accounts with no beneficial or legitimate investment purpose.

271.   The fact of such misappropriating transfers is not a mere indication of the Center's breach of its fiduciary duties to Plaintiffs and Class Members but rather, constitutes a breach fiduciary duty in and of itself.

272.   The Center and BAM breached their fiduciary duties throughout the ongoing dissipation of SNT assets until almost all had been depleted.

273.   Based on the numerous red flags as set forth above, *inter alia*, Defendants Govoni, Golden, Staunton, and BFG had actual knowledge that the

Center and BAM were breaching their fiduciary duties to Plaintiffs and Class Members.

274.   In the alternative, these Defendants were willfully blind to the Center's and BAM's breaches of fiduciary duties owed to Plaintiffs and Class Members in light of the copious, persisting evidence thereof.

275.   These Defendants knowingly and substantially participated in and/or provided substantial assistance in the Center's and BAM's breaches of fiduciary duties owed to Plaintiffs and Class Members.

276.   The following acts and/or omissions by these Defendants, among others, substantially assisted the Center and BAM in breaching their fiduciary duties to Plaintiffs and Class Members:

a.   Causing the misappropriation of SNT assets to BFG knowing that by allowing that misappropriation to occur, the Center was in breach of its fiduciary duties owed to Plaintiffs and Class Members;

b.   Using SNT funds for "purported loans," which even if legitimate (they were not), were underperforming investments and bad debt, through self-dealing transactions, knowing that by allowing those imprudent investments to occur, the Center and BAM were in breach of their fiduciary duties owed to Plaintiffs and Class Members; and

c.   Depleting SNT accounts to fund the purported loan transfers to BFG, and in turn, other entities under common, knowing that by allowing and/or causing such depletion of SNT property, the Center and BAM were in breach of their fiduciary duties owed to Plaintiffs and Class Members.

277.    As a direct and proximate result of the Center's and BAM's breaches of the fiduciary duties owed to Plaintiffs, aided and abetted by these Defendants, Plaintiffs and Class Members have been injured, including by the conversion and waste of over $100,000,000 in SNT assets.

278.    But for these Defendants' aiding and abetting the Center's and BAM's breaches of their fiduciary duties owed to Plaintiffs and Class Members, the decade-plus scheme would have been prevented, the SNT accounts would have remained segregated and protected, and Plaintiffs' and Class Members' injuries would have been avoided, damages for which these Defendants are jointly and severally liable.

## COUNT VI: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### Against American Momentum Bank

279.    Plaintiffs re-allege and incorporate paragraphs 1 through 191 above as though set forth fully herein.

280.    Plaintiffs and Class Members entrusted the administration of SNT assets to the Center, as the SNTs' and Plaintiffs' and Class Members' trustee and fiduciary.

281.    At all relevant times, Plaintiffs and Class Members reposed trust and confidence in the Center to exercise its superior expertise in serving as trustee and administering SNT property.

282.    Additionally,    Plaintiffs    and    Class    Members    entrusted    the

management and investment of SNT assets to BAM, as the Center's agent and the SNTs' and Plaintiffs' and Class Members' investment manager and fiduciary.

283.   At all relevant times, Plaintiffs and Class Members reposed trust and confidence in BAM to exercise its superior expertise in serving as the SNTs' investment manager and the Center's agent and in managing SNT property.

284.   By virtue of the imbalance of superiority and vulnerability in the Center's relationship with Plaintiffs, the Center and Plaintiffs and Class Members had a special relationship giving rise to the Center's heightened, fiduciary duties of care, loyalty, and prudence owed to Plaintiffs.

285.   Similarly, by virtue of the imbalance of superiority and vulnerability in BAM's relationship with Plaintiffs, BAM and Plaintiffs and Class Members had a special relationship giving rise to BAM's heightened, fiduciary duties of care, loyalty, and prudence owed to Plaintiffs and Class Members.

286.   As the SNTs' trustee, the Center owed Plaintiffs and Class Members the fiduciary duties to administer, inspect, and invest SNT property prudently and reasonably.

287.   As the SNTs' investment manager and the Center's agent, BAM owed Plaintiffs and Class Members the fiduciary duties to administer, manage, and invest SNT property prudently and reasonably.

288.   At all relevant times, American Momentum Bank knew that the

Center, BAM, and BFG were all controlled by the same principals and beneficial owners such that transfers from the SNT accounts in its custody to BFG involved an impermissible conflict of interest.

289.   At all relevant times, American Momentum Bank knew that the SNT accounts in its custody were special-deposit accounts holding assets in trust for Beneficiaries, which were to be used only for their particular, designated purposes of prudent investments and payments for Beneficiaries' expenses.

290.   At all relevant times, American Momentum Bank knew that the Center and BAM owed strict duties of care, loyalty, and prudence to the SNTs and Plaintiffs and Class Members.

291.   At all relevant times, American Momentum Bank knew that the Center and BAM would be in breach of their duties of care, prudence, and good faith by allowing and/or causing SNT funds to be misappropriated and diverted to fund the sham BFG loan.

292.   At all relevant times, American Momentum Bank knew that the Center and BAM would be in breach of their duties of care, prudence, and good faith by allowing and/or causing SNT accounts to be almost completely depleted through transfers to BFG.

293.   At all relevant times, multiple red flags gave American Momentum Bank actual knowledge that the Center and BAM were in breach of their fiduciary

duties of care, loyalty, prudence, and good faith owed to the SNTs and Plaintiffs and Class Members, including without limitation the following:

    a. The Center failed to segregate SNT funds and commingled them with the Center's operating and/or master general-deposit accounts at American Momentum Bank;

    b. BAM caused the misappropriation of $100,000,000 in SNT assets through transfers to its alter ego BFG;

    c. There had been persistent issues with insufficient funds, overdrafts, and returned checks related to the SNT accounts;

    d. Over $100,000,000 was transferred from the SNT accounts over a decade-plus period without corresponding returns as would be expected, with the only money flowing into the SNT accounts being from existing and new Beneficiaries;

    e. Over $100,000,000 was transferred from the SNT accounts to one or more accounts at American Momentum Bank opened by BFG, an entity owned and controlled by BAM's beneficial owners and the Center's founders, insiders, and substantial contributors;

    f. The transfer of over $100,000,000 constituted a self-dealing transaction involving a clear conflict of interest; and

    g. BFG was struggling financially when the substantial misappropriation from SNT accounts took place, demonstrating that the transfers were not made pursuant to a prudent or legitimate investment decision.

    294.    These numerous red flags stated above were not mere indications of the Center's and BAM's breaches of their fiduciary duties owed to Plaintiffs and Class Members; rather, each fact constitutes a breach of fiduciary duty in and of

itself.

295.   Based on the numerous above red flags, and likely numerous others that will be revealed in discovery, American Momentum Bank had actual knowledge that the funds in the SNT accounts in its custody were being misappropriated and the Center and BAM were in breach of their fiduciary duties to owed to Plaintiffs and Class Members.

296.   In the alternative, American Momentum Bank was willfully blind to the Center's breaches of fiduciary duties owed to Plaintiffs and Class Members in light of the numerous, persisting evidence thereof as set forth above.

297.   At all relevant times, American Momentum Bank had a duty to make a reasonable inquiry into the diversion of SNT funds, and take reasonable steps to alert about and prevent such misappropriation, when confronted with clear evidence that those funds were being transferred and mishandled in breach of the Center's and BAM's fiduciary duties to Plaintiffs and Class Members.

298.   American Momentum Bank knowingly and substantially participated in and/or provided substantial assistance in the Center's breaches of fiduciary duties owed to Plaintiffs.

299.   The following acts and/or omissions by American Momentum Bank, among others, substantially assisted the Center and BAM in breaching their fiduciary duties to Plaintiffs and Class Members:

    a.  Failing to make reasonable inquiry into the substantial decade-long transfers of funds out of the SNT accounts without corresponding returns as would be expected;

    b.  Failing to make reasonable inquiry into the substantial decade-plus transfers of funds out of the SNT accounts while knowing that the instigator and recipient of such transfers had clear conflicts of interest;

    c.  Failing to make reasonable inquiry into the suspect transfers to BFG and corresponding depletion of SNT assets despite being confronted with clear evidence of that wrongdoing;

    d.  Misrepresenting to the FDIC that no trust assets were in American Momentum Bank's custody to avoid the FDIC conducting audits or examinations of SNT accounts;

    e.  Failing to take reasonable steps to prevent the commingling, misappropriation, and waste of SNT funds when confronted with clear evidence such conduct was taking place; and

    f.  Facilitating the wrongful siphoning of SNT assets over a decade-long period amidst recurring issues related to overdrafts and returned checks, without taking minimal steps to prevent, remedy, or notify about the scheme.

300.    As a direct and proximate result of the Center's and BAM's breaches of their fiduciary duties owed to Plaintiffs and Class Members, aided and abetted by American Momentum Bank, Plaintiffs and Class Members have been injured, including by the conversion and waste of over $100,000,000 in SNT assets.

301.    But for American Momentum Bank's aiding and abetting the Center's and BAM's breaches of their fiduciary duties owed to Plaintiffs, the decade-plus scheme would have been prevented or at the very least, stopped, and the SNT

accounts maintained at American Momentum Bank would have been kept segregated and protected.

## COUNT VII: NEGLIGENCE
### Against Govoni, Staunton, and Golden

302.   Plaintiffs re-allege and incorporate paragraphs 1–122, 126, 129, 130, 137, 139, 164, 167, 168, and 174–91 above as though set forth fully herein.

303.   At all relevant times, Defendants Govoni, Staunton, and Golden, as founders, agents, service providers, and substantial contributors of and to the Center, owed Plaintiffs and Class Members as SNT Beneficiaries the duty to act reasonable with respect to the SNT assets they handled.

304.   At all relevant times, these Defendants offered their investment management, advising, legal, and accounting services to the Center in connection with the SNTs and thus, assumed the duty to take reasonable steps to avoid harm to Plaintiffs and Class Members in that undertaking.

305.   These Defendants' duties of care owed to Plaintiffs and Class Members required them to ensure that SNT account funds were not being used or invested in transactions that constitute self-dealing or put the SNT property at risk.

306.   These Defendants' duties of care owed to Plaintiffs and Class Members further required them to account for SNT account funds with the level of diligence required to accurately inform Beneficiaries and prevent SNT property from being wasted, misappropriated, or used in self-dealing transactions.

307.    These Defendants' duties of care owed to Plaintiffs and Class Members further required them to notify Beneficiaries promptly upon discovering any fraud, conversion, or other harmful transaction related to Beneficiaries' SNTs.

308.    These Defendants knew or should have known that transferring over $100,000,000 from the Plaintiffs' and Class Members' SNT accounts to BFG for the sham BFG loan would forever harm the SNTs and injure Plaintiffs and Class Members.

309.    These Defendants knew or should have that by delaying disclosure or notification to Plaintiffs and Class Members that the SNT funds had been converted to BFG's wrongful use, they would cause Plaintiffs and Class Members to take appropriate measures for the (now very real) possibility that their SNT accounts are compromised.

310.    Defendants Govoni, Staunton, and Golden breached their duties of care owed to Plaintiffs and Class Members and were negligent by the following acts and/or omissions, among others:

  a.  Allowing and/or causing SNT account funds to be converted, misappropriated, and wasted;

  b.  Using the funds siphoned from the SNT accounts to furnish underperforming, largely uncollectable loan agreements with no legitimate or prudent business purpose; and

  c.  Failing to notify Plaintiffs and Class Members of the depletion of their SNT accounts during the decade-plus period such conduct took place;

311.   Any reasonable SNT investment manager, agent, founder, or other fiduciary would have foreseen that the negligent acts and omissions described above would harm Plaintiffs and Class Members.

312.   These Defendants' negligent acts and omissions described herein were the direct and proximate cause of and/or a substantial contributing factor in Plaintiffs' and Class Members' injuries and resulting damages.

313.   But for these Defendants' negligent acts and omissions described herein, the conversion of SNT assets would have been discovered promptly, and $100,000,000 in misappropriated funds would have instead remained segregated and preserved in SNT accounts.

314.   As the direct and proximate result of these Defendants' negligent breaches of their duties of care as described herein, Plaintiffs and Class Members suffered damages including the depletion of over $100,000,000 in SNT assets that occurred over a ten-year period without Plaintiffs' and Class Members' knowledge or consent, damages for which these Defendants are jointly and severally liable.

## COUNT VIII: NEGLIGENCE
### Against American Momentum Bank

315.   Plaintiffs re-allege and incorporate paragraphs 1 through 191 above as though set forth fully herein.

316.    At all relevant times, Defendant American Momentum Bank owed Plaintiffs and Class Members the duty to identify and understand the risks associated with SNT accounts in its custody and conduct reviews of those accounts and their transactions commensurate with said risks.

317.    At all relevant times, American Momentum Bank owed Plaintiffs and Class Members the duty to take reasonable steps to safeguard SNT funds in its custody if presented with clear evidence indicating that SNT funds were being mishandled by a fiduciary.

318.    At all relevant times, Defendant American Momentum Bank owed Plaintiffs and Class Members the duty to take reasonable steps to safeguard SNT funds in its custody if presented with clear evidence indicating that SNT funds were being mishandled by a fiduciary.

319.    At all relevant times, American Momentum Bank owed Plaintiffs and Class Members a fiduciary duty to "know its customer" and conduct reasonable due diligence with regard to the opening and use of accounts in its custody to ensure that SNT accounts were not being used for improper purposes or to benefit persons or entities that were not entitled to such benefit.

320.    At all relevant times, numerous red flags related to the pooled SNT accounts and the BFG account at American Momentum Bank clearly evidenced that SNT account funds were being mishandled and misappropriated by the SNTs'

fiduciary, including without limitation the following:

    a. The Center failed to segregate SNT funds and commingled them with funds in the Center's operating and/or master accounts at American Momentum Bank;

    b. There had been issues with insufficient funds, overdrafts, and returned checks related to the SNT accounts;

    c. Over $100,000,000 was transferred from the SNT accounts over a decade-plus period without corresponding returns as would be expected and the only money flowing in was from existing and new Beneficiaries;

    d. Over $100,000,000 was transferred from the SNT accounts to one or more accounts at American Momentum Bank held by BFG, an entity owned and controlled by the Center's founders, insiders, and substantial contributors;

    e. The transfer of over $100,000,000 constituted a self-dealing transaction;

    f. BFG was struggling financially when the substantial transfers from the SNT accounts took place, evidencing that the transfers were not made pursuant to a prudent or legitimate investment decision;

    g. BFG transferred the millions of dollars in funds from the SNT accounts to its affiliate, Prospect, an entity that had not previously operated or generated revenue.

321. Given the numerous red flags that SNT account funds were being misappropriated and mishandled, the sole reasonable inference is that BFG's misappropriation was intended and made known to American Momentum Bank.

322. At all relevant times, by virtue of the clear and copious evidence that SNT accounts maintained at American Momentum Bank were being

misappropriated and mishandled in substantial amounts and on a recurring basis, American Momentum Bank owed Plaintiffs and Class Members the duty to inquire further into the circumstances surrounding those warning signs and take reasonable steps to prevent the further dissipation of SNT assets.

323.   American Momentum Bank knew or should have known, by virtue of the numerous red flags and copious evidence that funds were being improperly diverted from the pooled SNT account, that failing to inquire further into those warning signs or take reasonable steps to prevent further dissipation of SNT assets would foreseeably harm Plaintiffs.

324.   American Momentum Bank breached its duty of care owed to Plaintiffs and Class Members and was negligent in that it failed to inquire further into the use and status of SNT assets when confronted with and aware of clear evidence that the ongoing misappropriation and mishandling of SNT assets was taking place.

325.   American Momentum Bank further breached its duty of care owed to Plaintiffs and was negligent in that it failed to take reasonable steps to prevent the further dissipation of SNT assets when confronted with and aware of clear evidence that the ongoing misappropriation and mishandling of SNT assets was taking place.

326.   Any reasonable bank custodian of fiduciary accounts would have

foreseen that the negligent acts and omissions described above would harm the SNT Beneficiaries.

327.    American Momentum Bank's negligent acts and omissions described herein were the direct and proximate cause of and/or a substantial contributing factor in Plaintiffs' and Class Members' injuries and resulting damages.

328.    But for American Momentum Bank's negligent acts and omissions described herein, the misappropriation and conversion of SNT assets would have been discovered promptly, and the $100,000,000 in stolen funds would have remained segregated and preserved in the SNT accounts.

329.    As the direct and proximate result of American Momentum Bank's negligent breaches its duty of care as described herein, Plaintiffs and Class Members suffered damages including the depletion of over $100,000,000 in SNT assets that occurred over more than a decade without Plaintiffs' and Class Members' knowledge or consent.

## COUNT IX: NEGLIGENCE
### Against FTAS

330.    Plaintiffs re-allege and incorporate paragraphs 1–122, 126, 129, 130, 137, 139, 164, 167, 168, and 174–91 above as though set forth fully herein.

331.    At all relevant times, Defendant FTAS, as an agent to the Center and an accounting service provider for Plaintiffs' and Class Members' SNTs, owed Plaintiffs and Class Members the duty to act reasonable with respect to the SNT

assets it handled.

332.   At all relevant times, FTAS offered its accounting services to Plaintiffs and Class Members in connection with their SNTs and thus, assumed the duty to take reasonable steps to avoid harm to Plaintiffs and Class Members in that undertaking.

333.   FTAS's duties of care owed to Plaintiffs and Class Members required it to accurately and transparently account for SNT property with the level of diligence required to ensure that SNT account funds were not being used or invested in transactions that constitute self-dealing or put the SNT property at risk, and so that Plaintiffs and Class Members would be informed if such improper transactions or risks were present.

334.   FTAS's duties of care owed to Plaintiffs and Class Members further required it to notify them promptly upon discovering any fraud, conversion, or other harmful transaction related to their SNTs.

335.   Additionally, FTAS owed Plaintiffs and Class Members the duty to ensure that no excessive or unreasonable fees were charged to their SNTs.

336.   FTAS knew or should have known that failing to accurately or transparently account for SNT property would conceal the misappropriation of over $100,000,000.00 from the Plaintiffs' and Class Members' SNTs accounts to BFG for the sham BFG loan and thus, would harm the SNTs and injure Plaintiffs

and Class Members.

337.   FTAS knew or should have known that by delaying disclosure or notification to Plaintiffs and Class Members that the SNT funds had been converted to BFG's wrongful use, it would prevent Plaintiffs and Class Members from taking appropriate measures for the (now very real) possibility that their SNT accounts are compromised.

338.   FTAS knew or should have known that charging excessive and unreasonable fees to SNTs would cause further harm to Plaintiffs and Class Members in addition to the injuries they had already suffered due to misappropriation of $100,000,000.00 in SNT assets to BFG.

339.   FTAS breached its duties of care owed to Plaintiffs and Class Members by failing to take reasonable steps to provide accurate and transparent accounting to reveal the $100,000,000.00 in self-dealing transactions that had no legitimate, reasonable, or prudent purpose and involved unambiguous conflicts of interest.

340.   FTAS further breached its duties of care owed to Plaintiffs and Class Members by directly charging thousands of dollars in fees to SNTs while simultaneously receiving over $4,600,000.00 from the Center over a five-year span, which fees were unreasonable due to the woefully inadequate accounting that FTAS provided, which obfuscated the impermissible misappropriation of over

$100,000,000 from SNT accounts.

341.    Any reasonable SNT accountant or service provider would have foreseen that the negligent acts and omissions described above would harm Plaintiffs and Class Members.

342.    FTAS's negligent acts and omissions described herein were the direct and proximate cause of and/or a substantial contributing factor in Plaintiffs' and Class Members' injuries and resulting damages.

343.    But for FTAS's negligent acts and omissions described herein, the conversion of SNT assets would have been discovered promptly, and $100,000,000 in misappropriated funds would have instead remained segregated and preserved in SNT accounts.

344.    As the direct and proximate result of FTAS's negligent breaches of their duties of care as described herein, Plaintiffs and Class Members suffered damages including the depletion of over $100,000,000 in SNT assets that occurred over a decade-plus period without Plaintiffs' and Class Members' knowledge or consent, damages for which FTAS is liable.

### COUNT X: VIOLATION OF UNIFORM FRAUDULENT TRANSFER ACT, FLA. STAT, § 726.105
**Against BFG and Prospect Funding**

345.    Plaintiffs re-allege and incorporate paragraphs 1–122, 126, 129, 130, 137, 139, 164, 167, 168, and 174–91 above as though set forth fully herein.

346.   On a continuing basis from 2011 through 2020, BFG transferred Prospect Funding approximately $14,000,000 in funds misappropriated and converted from Plaintiffs' and Class Members' pooled SNT accounts (for purposes of this Count, the "Transfer").

347.   Plaintiffs' and Class Members' claims to the misappropriated SNT assets and against BFG for the conversion arose before the Transfer was made.

348.   At all relevant times, including when the Transfer took place, BFG and Prospect Funding had actual knowledge of Plaintiffs' and Class Members' claims against BFG.

349.   The Transfer was made with the actual intent to defraud, delay, and/or hinder BFG's creditors—specifically, Plaintiffs.

350.   While Plaintiffs' and Class Members' claims against BFG remained unsatisfied, BFG transferred $14,000,000 to Prospect Funding as a purported loan, knowing that said loan would not be repaid.

351.   Upon information and belief, the Transfer was of all or substantially all of BFG's assets at the time it was made.

352.   BFG made the Transfer without receiving reasonably equivalent value in exchange, in that it transferred $14,000,000 to its affiliate and subsidiary Prospect Funding in exchange for a sham promissory note and loan agreements while knowing, based on the companies' overlapping ownership, control, and

management, that Prospect Funding would not repay BFG.

353.   Upon information and belief, BFG was insolvent when the Transfer took place and/or was rendered insolvent as a result of the Transfer.

354.   At all relevant times including when the Transfer was made, BFG was engaged or about to engage in a transaction for which its remaining assets were unreasonably small relatively.

355.   At all relevant times including when the Transfer was made, BFG intended and/or reasonably should have known that it would incur debts beyond its ability to pay them as they became due.

356.   BFG has indeed been unable to repay its debts as they become due, including the over $100,000,000 debt owed to the SNTs for the purported BFG Loan.

357.   The Transfer was not made in the ordinary course of BFG's or Prospect's business.

358.   BFG's owners and principals retained control over the funds after the Transfer to Prospect, by virtue of Prospect Funding and BFG's overlapping ownership and control.

359.   At all relevant times, BFG was Prospect Funding's majority owner such that Prospect was BFG's insider when the Transfer took place.

360.   At all relevant times including when the Transfer was made, by virtue

of Prospect Funding and BFG's overlapping ownership and control Prospect Funding knew and/or had reason to know that BFG was insolvent and/or would be rendered insolvent as a result of the Transfer.

361. At all relevant times, including when the Transfer was made, by virtue of Prospect Funding and BFG's overlapping ownership and control Prospect Funding knew and/or should have  known about Plaintiffs' and Class Members' claims against BFG.

362. The Transfer was concealed from Plaintiffs and Class Members, who were kept in the dark before being shocked by revelations related to the chapter in the Center's February 2024 chapter 11 bankruptcy filings.

363. Prospect Funding did not receive the Transfer in good faith or for reasonably equivalent value.

364. Pursuant to section 726.108, Florida Statutes, remedies for the fraudulent Transfer to which Plaintiffs and Class Members are entitled include:

    a. Avoidance of the Transfer to the extent necessary to satisfy the creditor's claim;

    b. An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with applicable law; or

    c. Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

    i.   An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

    ii.   Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

    iii.   Any other relief the circumstances may require.

## COUNT XI: UNJUST ENRICHMENT
### Against BFG

365.   Plaintiffs re-allege and incorporate paragraphs 1–122, 126, 129, 130, 137, 139, 164, 167, 168, and 174–91 above as though set forth fully herein.

366.   Plaintiffs and Class Members conferred a monetary benefit on BFG by providing $100,000,000 to BFG from pooled SNT accounts.

367.   In exchange, Plaintiffs and Class Members should have received a benefit to their SNTs or similar return on their investment.

368.   BFG knew that Plaintiffs and Class Members conferred and it retained a benefit in the form of funds siphoned from their SNTs for the sham BFG Loan.

369.   BFG acquired the SNT assets through inequitable means in that BFG concealed the transfers to BFG and obtained the money from the pooled SNT accounts.

370.   Defendant BFG enriched itself by siphoning $100,000,000 from pooled SNT accounts meant to provide for often-vulnerable disabled and elderly individuals.

371.   Under principles of equity and good conscience, BFG should not be allowed to retain the $100,00,000.00 wrongfully misappropriated and converted from Plaintiffs and Class Members' SNTs.

372.   Plaintiffs and Class Members have no adequate remedy at law.

373.   As a direct and proximate result of BFG's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

374.   BFG should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that BFG unjustly received from them.

### COUNT XII: UNJUST ENRICHMENT
**Against Prospect Funding and Prospect Finance**

375.   Plaintiffs re-allege and incorporate paragraphs 1–122, 126, 129, 130, 137, 139, 164, 167, 168, and 174–91 above as though set forth fully herein.

376.   Plaintiffs and Class Members conferred a monetary benefit on Defendants Prospect Funding and Prospect Finance by providing millions of dollars originating in SNT accounts to these Defendants.

377.   In exchange, Plaintiffs and Class Members should have received a benefit to their SNTs or similar return on their investment.

378.   Prospect Funding and Prospect Finance knew that Plaintiffs and Class Members conferred and it retained a benefit in the form of funds siphoned from

their SNTs for the sham BFG Loan and subsequent monetary transfers to Prospect Funding and Prospect Finance.

379.   Prospect Funding and Prospect Finance acquired the SNT assets through inequitable means in that BFG, Prospect Funding, and Prospect Finance concealed the transfers to BFG and the subsequent transfers to Prospect Funding and Prospect Finance, and obtained the money for those transfers from the pooled SNT accounts.

380.   These Defendants enriched themselves by siphoning millions of dollars from pooled SNT accounts meant to provide for often-vulnerable disabled and elderly individuals.

381.   Under principles of equity and good conscience, Prospect Funding and Prospect Finance should not be allowed to retain the millions of dollars wrongfully misappropriated and converted from Plaintiffs and Class Members' SNTs.

382.   Plaintiffs and Class Members have no adequate remedy at law.

383.   As a direct and proximate result of Prospect Funding and Prospect Finance's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, for which these Defendants are jointly and severally liable.

384.   Prospect Funding and Prospect Finance should be compelled to

disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and

Class Members, proceeds that these Defendants unjustly received from them.

## COUNT XIII: DECLARATORY RELIEF - ALTER EGO
### Against BFG, BHC, Prospect Funding, Prospect Finance, Prospect III, Govoni, Golden, and Staunton

385.    Plaintiffs re-allege and incorporate paragraphs 1–122, 126, 129, 130,

137, 139, 164, 167, 168, and 174–91 above as though set forth fully herein.

386.    A bona fide dispute exists as to whether BFG is the alter ego or and/or

mere instrumentality of its controllers Govoni, Golden, and Staunton.

387.    A bona fide dispute exists as to whether BHC is the alter ego or

and/or mere instrumentality of its controllers Govoni, Golden, and Staunton.

388.    An additional bona fide dispute exists as to whether Prospect

Funding, Prospect Finance, and Prospect III (together, "Prospect") are alter egos

and/or mere instrumentalities of each other and of their majority owner BFG.

389.    Upon information and belief, at all relevant times, BFG owned a

majority interest in Prospect.

390.    Upon information and belief, at all relevant times, Govoni, Golden,

and Staunton beneficially owned BFG, BHC, and Prospect.

391.    At all relevant times, BFG, BHC, and Prospect shared the same offices

located at 12707 49th Street N, Clearwater, Florida 33762.

392.    At all relevant times, Govoni, Golden, and Staunton dominated and

controlled BFG, BHC, and Prospect to such an extent that the companies had no independent existence or purpose.

393.   Govoni, Golden, and Staunton caused BFG, BHC's and Prospect's corporate funds to be commingled with their own and/or with those of other entities under common control.

394.   For example, Govoni, Golden, and Staunton caused and allowed BFG to make the $8,000,000 Prospect Loan to its commonly controlled alter ego Prospect, which had not then conducted any business or earned any revenue and presumably, had no credit when the loan was made.  Then, Govoni, Golden, and Staunton caused and allowed Prospect to use the loan funds to further BFG's fraud against Plaintiffs and Class Members while defrauding additional investors itself.

395.   Govoni, Golden, and Staunton improperly directed and misappropriated BFG's, BHC's, and Prospect's assets to their own use and benefit.

396.   For example, Govoni, Golden, and Staunton formed Prospect III to deplete and/or misappropriate the litigation claim interests that Prospect Finance had ostensibly purchased using the BFG Loan proceeds.  This further diminished the value of Prospect Finance's portfolio, and the chances that BFG or the investors it duped would recover anything from Prospect.

397.   Upon information and belief, Govoni, Golden, and Staunton used the funds wrongfully transferred from the SNT accounts to BFG's for their own

personal benefit and expenses and those of commonly controlled entities, including to capitalize their fraudulent lending scheme and/or by transferring said funds to BHC for subsequent use by its other subsidiaries under their control.

398.   Govoni, Golden, and Staunton treat BFG, BHC, and Prospect as shams and use those entities as mere instrumentalities for their own personal interests.

399.   Knowing due to the companies' shared directors, employees, books and records, and offices, that Prospect's claim portfolio collateralizing the Prospect Loan from BFG was largely uncollectable and worth less than the loan amount, BFG nonetheless transferred approximately $13 of stolen SNT funds to Prospect.

400.   Govoni, Golden, and Staunton used BFG, BHC, and Prospect for improper purposes and engaged in improper conduct by manipulating the companies and abusing their corporate forms to injure and defraud investors and Plaintiffs and Class Members, the Beneficiaries whose SNTs were misappropriated to fund the scheme.

401.   Upon information and belief, at all relevant times BFG, BHC, and Prospect were unable to pay debts as they became due in the normal course of business and therefore were and are either insolvent or in the vicinity of insolvency.

402.   Govoni, Golden, and Staunton depleted and converted BFG's, BHC's,

and Prospect's assets for their own personal benefit while refusing to repay the $100,000,000 taken from the SNTs.

403.   Govoni, Golden, and Staunton used a corporate structure wherein companies associated with BFG, BHC, and Prospect under these Defendants' common control were organized as legally distinct entities so that BFG's creditors, specifically including Plaintiffs and Class Members, would be forced to recover their debts from those companies in or nearing insolvency.

404.   Govoni, Golden, and Staunton used a corporate structure wherein companies associated with BFG, BHC, and Prospect under these Defendants' common control were organized as legally distinct entities for the additional improper purpose of delaying and hindering BFG's creditors, specifically including Plaintiffs and Class Members, through fraudulent insider transactions and transfers.

405.   Govoni, Golden, and Staunton used a corporate structure wherein companies associated with BFG, BHC, and Prospect under these Defendants' common control were organized as legally distinct entities for the additional improper purpose of concealing and obfuscating the self-dealing, nefarious transactions including the $100,000,000 in improper transfers from the pooled SNT accounts.

406.   Govani, Golden, and Staunton have exhibited a continuous and

ongoing pattern of forming and dissolving entities with shared owners, names, offices, and purposes, in order to further advance and conceal their fraudulent misappropriation of SNT funds.

407.   These alter ego Defendants' improper conduct is ongoing and presents a present harm and/or significant possibility of future harm to Plaintiffs' and Class Members' ability to recover the SNT funds upon which they depend, and declaratory relief is necessary to insure Plaintiffs' and Class Members' recovery.

408.   Plaintiffs and Class Members respectfully request that the Court enter judgment declaring as follows:

a. BFG is Govoni, Golden, and Staunton's alter ego and a mere instrumentality for these individual Defendants' affairs;

b. BHC is Govoni, Golden, and Staunton's alter ego and a mere instrumentality for these individual Defendants' affairs;

c. Prospect Funding, Prospect Holding, and Prospect III are each others' alter egos and mere instrumentalities for Govoni, Golden, and Staunton's affairs;

d. Prospect, BHC, and BFG are each others' alter egos and mere instrumentalities for Govoni, Golden, and Staunton's affairs;

e. Because they are alter egos, these Defendants' corporate forms shall

be disregarded for purposes of this action, such that a claim against one is considered a claim against all, and the conduct of one is considered the conduct of all; and

f.  As alter egos, these Defendants are jointly and severally liable for any judgment rendered against another alter ego Defendant in this action, such that Plaintiffs and Class Members may enforce any judgment against one alter ego Defendant by levying any and all alter ego Defendants' assets up to satisfaction of the judgment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendants and that the Court grants the following:

A.  For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

B.  For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined by a jury at trial;

C.  For declaratory relief holding Defendants Govoni, Golden, Staunton, BFG, BAM, Prospect Funding, Prospect Finance, and Prospect III jointly and severally liable, as alter egos, for any judgment rendered against one and/or all of these Defendants in this action, such that

Plaintiffs and Class Members may enforce any judgment against one

by levying the assets of any other up to satisfaction of the judgment;

D. For an award of attorneys' fees, costs, and litigation expenses, as

allowed by law;

E. For prejudgment interest on all amounts awarded; and

F. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demands a trial by jury of all issues so triable.

Dated: April 18, 2024                   Respectfully submitted.

By: *Jonathan M. Streisfeld*_____
Jeff Ostrow FBN 121452
David L. Ferguson FBN 981737
Jonathan M. Streisfeld FBN 117447
Caroline Herter FBN 1035444
**KOPELOWITZ OSTROW
FERGUSON WEISELBERG
GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
ostrow@kolawyers.com
ferguson@kolawyers.com
streisfeld@kolawyers.com
herter@kolawyers.com

and

Thomas H. Leeder FBN 746401
Andrew R. Smith FBN  107083
**LEEDER LAW**

8551 West Sunrise Blvd. | Ste. 202
Plantation, FL 33322
Telephone (954) 734-2382
pleadings@leederlaw.com

*Attorneys for Plaintiffs and the Putative
Class*